851 A.2d 758 (2004)
370 N.J. Super. 549
STATE of New Jersey, Plaintiff-Respondent,
v.
Ashakoor WALDEN, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued May 19, 2004.
Decided July 6, 2004.
*759 Alison Perrone, Designated Counsel, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Ms. Perrone, on the brief).
Steven J. Kaflowitz, Assistant Prosecutor, argued the cause for respondent (Theodore J. Romankow, Union County Prosecutor; attorney; Mr. Kaflowitz, of counsel and on the brief).
Before Judges KING, LINTNER and LISA.
The opinion of the court was delivered by LISA, J.A.D.
In his opening statement in this murder trial, the prosecutor informed the jury that a non-testifying co-defendant, who had pled guilty and accepted his responsibility for the crime, told the police that the defendant on trial was a co-perpetrator, and indeed the shooter. The prosecutor stated the co-defendant would testify accordingly. As part of his plea agreement, the co-defendant had agreed to testify. But when called as a witness, he refused. In his summation, the prosecutor vouched for the credibility of a witness who testified that defendant told him he participated in the crime. We hold that, although the prosecutor's comments in his opening statement may have been made in good faith and did not constitute "evidence," the prejudicial effect on defendant was devastating, and, coupled with the prosecutor's *760 vouching for the State's key witness who did testify, deprived the defendant of a fair trial.
Defendant, Ashakoor Walden, and his co-defendant, Duquan McElveen, were charged jointly in a twelve count indictment as follows: (1) first-degree murder of John Welsh, N.J.S.A. 2C:11-3a(1) or (2); (2) first-degree robbery of John Welsh, N.J.S.A. 2C:15-1; (3) first-degree felony murder of John Welsh, N.J.S.A. 2C:11-3a(3); (4) second-degree possession of a.32 caliber handgun with a purpose to use it unlawfully against John Welsh, N.J.S.A. 2C:39-4a; (5) second-degree unlawful possession of a .22 caliber handgun with a purpose to use it unlawfully against John Welsh, N.J.S.A. 2C:39-4a; (6) third-degree unlawful possession of a .32 caliber handgun without a permit, N.J.S.A. 2C:39-5b; (7) third-degree unlawful possession of.22 caliber handgun without a permit, N.J.S.A. 2C:39-5b; (8) first-degree robbery of Dion Johnson, N.J.S.A. 2C:15-1; (9) second-degree possession of a .32 caliber handgun with a purpose to use it unlawfully against Dion Johnson, N.J.S.A. 2C:39-4a; (10) second-degree possession of a .22 caliber handgun with a purpose to use it unlawfully against the person of Dion Johnson, N.J.S.A. 2C:39-4a; (11) third-degree unlawful possession of a .32 caliber handgun without a permit, N.J.S.A. 2C:39-5b; and (12) third-degree unlawful possession of a .22 caliber handgun without a permit, N.J.S.A. 2C:39-5b.
McElveen pled guilty to various charges in return for a recommended sentence of twenty years imprisonment. As part of his plea agreement with the prosecutor, McElveen agreed to testify truthfully against defendant. Defendant went to trial, and was convicted of counts one, two, three, four and six, namely the robbery, murder and felony murder of Welsh and possession of the .32 caliber handgun for an unlawful purpose against Welsh and unlawful possession of the .32 caliber handgun without a permit in connection with the murder of Welsh. After merging count three with count one, and count four with counts one and two, the judge imposed a sentence of life imprisonment with a thirty-year parole disqualifier for murder and imposed concurrent sentences on counts two (robbery) and six (unlawful possession of a weapon). Appropriate mandatory monetary assessments were imposed.
On appeal, defendant argues:
POINT I
DEFENDANT'S CONVICTIONS MUST BE VACATED BECAUSE THE STATE PROMISED IN OPENING ARGUMENT THAT THE CO-DEFENDANT WOULD TESTIFY AND IMPLICATE DEFENDANT IN THE SHOOTING, BUT THE CO-DEFENDANT NEVER ACTUALLY TESTIFIED. (Not Raised Below).
POINT II
PROSECUTORIAL MISCONDUCT DEPRIVED DEFENDANT OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL. (Not Raised Below).
POINT III
THE TRIAL COURT ABUSED ITS DISCRETION IN SENTENCING DEFENDANT TO A LIFE TERM BECAUSE A QUALITATIVE WEIGHING OF THE AGGRAVATING AND MITIGATING FACTORS DOES NOT SUPPORT SUCH A SENTENCE.
We agree with Points I and II and reverse and remand for a new trial. Because of this disposition, we do not reach Point III.
On the night of October 25, 1999, Welsh was walking in the company of two girls in Roselle. Two men wearing bandanas over their faces approached them, and ordered Welsh to come with them. The two girls ran. They heard gun shots. A woman in *761 the neighborhood taking out her garbage witnessed the shooting. According to her, one of the perpetrators fired a single shot at Welsh, who was walking slightly ahead of him. Welsh fell to the ground. The other perpetrator then stood over Welsh and fired two shots at him. Neither of the perpetrators was identified by any of the witnesses.
Temil Green lived in the neighborhood. He was not home when the shooting occurred. He came to his home a short while afterwards and observed the police activity in the immediate vicinity of his home. He went into his home and found defendant, a lifelong friend and neighbor, in his living room. Defendant was moving around quickly and kept looking out of the window. According to Green, defendant told him that defendant and McElveen approached Welsh, intending to rob him, McElveen told the girls to leave, then McElveen shot Welsh in the head, after which defendant "started shooting, too" and that he also shot Welsh. Green further related that defendant told him he had thrown his gun over a fence in the neighborhood. Defendant then left Green's house for about five minutes for the purpose of retrieving the gun. Defendant returned with a handgun, which defendant wrapped in a tee-shirt and hid it in Green's attic. Before defendant wrapped it in the tee-shirt, Green saw the gun for a "couple seconds." The next morning, at about 11:00 a.m., defendant returned to Green's home and took the gun, still wrapped in the tee-shirt. The gun was never again displayed to Green by defendant.
Through their investigation, the police recovered two handguns. Upon execution of a search warrant at McElveen's home, a .22 caliber gun was recovered on November 3, 1999. Two days later, based upon information received (presumably from McElveen), a .32 caliber gun was recovered from the Rahway River near the Lawrence Street bridge. The medical examiner established that Welsh sustained two bullet wounds, one to the side of his chest and one to the back of his head. Both guns recovered by the police were determined to be operable. The State's ballistics expert concluded that both bullets found in Welsh's body had been fired from a .32 caliber revolver. One of those bullets was fired from the gun recovered from the river. The other was too deformed for such a determination.
We need not discuss the facts pertaining to the charges of robbery and weapons offenses with respect to Johnson. We merely note that Johnson claims to have been robbed by two hooded men in the same vicinity in Roselle shortly before the robbery and murder of Welsh. As we have stated, defendant was not convicted of any charges with respect to Johnson.
In his opening statement, the prosecutor told the jury:
Now, you are also going to have in this case testimony from one guy, [McElveen], the codefendant, [defendant's] best friend in the world and I will tell you right now [McElveen] pled guilty, took responsibility for his role in the killing of John Welsh, in the robbery of John Welsh and in the robbery of Dion Johnson, Little Mo. He is facing a 20-year sentence. To some people that sounds like a lot. To some people it may not sound like enough.
Ladies and gentlemen, from day one he turned his best friend in and has consistently said how [defendant] was the shooter....
Duquan McElveen, the best friend, tells about the .22 caliber. We go to his apartment with the search warrant and we get it also in addition to the clothes and mask being worn that night. We *762 have all of that evidence and you are going to hear from [McElveen]. He is going to tell you about the beef and tell you about the events of that night in a way that nobody else could because he was there. He was part of it. He was the defendant's best friend.
During his case-in-chief, the prosecutor called Green as a witness, who related the events as we have described above. The prosecutor called McElveen, who was in custody, awaiting sentencing at that time. McElveen affirmed in the presence of the jury, but then announced that he would not testify. The judge immediately excused the jury. After some colloquy between the judge, the attorneys, and McElveen regarding his agreement to testify and his persistent refusal, McElveen was excused from the courtroom. The next day, through counsel, McElveen advised the parties he would be willing to testify. The prosecutor decided not to call him and rested. The defense did not call him.
In his general charges to the jury, at the beginning of trial and during the final charge, the judge expressed the general admonition that comments of the attorneys do not constitute evidence, and the case must be decided based upon the evidence. No specific curative instruction was requested or given regarding the prosecutor's opening comments about McElveen.
Defendant argues on appeal that the prosecutor's comments were tantamount to presenting to the jury the hearsay statement of McElveen, but depriving defendant of the right to confront and cross-examine the declarant. The hearsay statement of a co-defendant inculpating the defendant on trial is generally prohibited. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L. Ed.2d 476 (1968); State v. Young, 46 N.J. 152, 215 A.2d 352 (1965). The State correctly points out that the comments of an attorney in an opening statement do not constitute evidence, and the jury was so advised. Therefore, according to the State, the practice prohibited by these cases did not occur.
In a testimonial context, we have reversed a murder conviction, despite overwhelming evidence of guilt, where a detective was allowed to state that a non-testifying co-defendant had given a statement blaming the defendant for the killing and had said in an interview that he blamed most of the violence on the defendant. State v. Laboy, 270 N.J.Super. 296, 302, 637 A.2d 184 (App.Div.1994). Defendant had given a detailed confession, which was presented to the jury. Id. at 301, 637 A.2d 184. We noted that evidence of the co-defendant's statements violated the proscriptions of Bruton and Young, and that out-of-court statements of co-defendants have traditionally been viewed with suspicion, are typically unreliable, are subject to suspect credibility, and are devastating to the defendant on trial. Id. at 303-04, 637 A.2d 184. The effect of allowing this evidence is inherently and devastatingly prejudicial. Id. at 304, 637 A.2d 184. The prejudice, of course, is compounded intolerably in the absence of confrontation and the ability to cross-examine. Ibid.
We noted in Laboy "that a limiting instruction would not have sufficed to eradicate the prejudice emanating from admission of [the non-testifying co-defendant's] statement." Id. at 306, 637 A.2d 184. Allowing an inculpatory out-of-court statement from a non-testifying co-defendant, coupled with a limiting instruction, must be reserved only for those circumstances where there is a compelling reason for the statement's admission. Id. at 306-07, 637 A.2d 184. In those situations, the desired effect of a limiting instruction is questionable at best. Id. at 307, 637 A.2d 184. We found no justifiable need for admission of *763 the statement in Laboy, its only purpose being to provide additional evidence against the defendant. Id. at 305-07, 637 A.2d 184.
In Laboy, the offending statement was presented to the jury from the lips of a testifying police detective. In the case before us, the statement came not from a witness, who is under oath and subject to cross-examination, but from the prosecutor. We have had occasion to discuss a circumstance similar to that presented here. In State v. Torres, 328 N.J.Super. 77, 83-84, 744 A.2d 699 (App.Div.2000), the prosecutor informed the jury in his opening statement that a non-testifying co-defendant had pled guilty to all three murders, had been sentenced to life imprisonment, and would provide detailed testimony concerning the extent of the defendant's involvement in the murders. When the co-defendant was called to testify and refused, the defense moved for a mistrial, which was granted "because the mark left by the assistant prosecutor in his opening statement was indelible and could not be eradicated by a curative instruction." Id. at 84, 744 A.2d 699. We stressed that the prosecutor could have obviated the risk of causing prejudice to the defendant by seeking a pretrial hearing to determine whether the co-defendant would testify or invoke his Fifth Amendment privilege. Id. at 94-95, 744 A.2d 699. In the case before us, the prosecutor urges that he had no reason to believe McElveen would refuse to testify in light of his plea agreement. Nevertheless, he did not "firm this up" directly with McElveen before making the damaging opening statement.
More significantly, we admonished in Torres that "the assistant prosecutor's detailed prediction concerning [the co-defendant's] prospective testimony cannot be condoned. A prosecutor's opening statement should provide an outline or roadmap of the State's case. It should be limited to a general recital of what the State expects, in good faith, to prove by competent evidence." Id. at 95, 744 A.2d 699 (emphasis added) (citations omitted).
We do not question whether the prosecutor acted in good faith. Whether he did or not, he made the prejudicial statement at his peril. In accordance with the Torres admonitions, prosecutors are well advised to keep such potentially prejudicial comments very general and non-committal, or not make them at all, when dealing with anticipated testimony from a co-perpetrator, co-conspirator, or, for that matter, any witness from the criminal milieu. It is not at all unusual for such individuals to refuse to testify or to testify in an unpredictable manner. Prosecutors should be aware of such potential occurrences and be careful what they forecast in their opening statements.
Prosecutors are the representatives of the State, a position which carries great prestige with jurors. Their statements, as representatives of the State, have a tendency to be given great weight by jurors. That the inculpatory information was provided by the prosecuting attorney, rather than a prosecution witness, does not lessen the prejudicial impact on defendant. From the outset of this trial, it was imparted to the jurors that McElveen, who was there at the scene of the crime and who accepted his responsibility and pled guilty, told the police that defendant was the co-perpetrator and, indeed, that it was defendant, McElveen's best friend, who was the more culpable of the two, "the shooter."
The State seeks refuge in Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). We are unpersuaded. There, the prosecutor summarized for the jury the testimony expected from a co-defendant *764 inculpating the defendant on trial, but the co-defendant refused to testify. A limiting instruction was given. The Court noted that the described statement of the co-defendant "was not a vitally important part of the prosecution's case" and that "in these circumstances the limiting instructions given were sufficient to protect petitioner's constitutional rights." Id. at 735, 89 S.Ct. at 1423, 22 L.Ed.2d at 691. The Court cautioned, however, that "[i]t may be that some remarks included in an opening or closing statement could be so prejudicial that a finding of error, or even constitutional error, would be unavoidable." Id. at 736, 89 S.Ct. at 1423, 22 L.Ed.2d at 691 (emphasis added). The Court thus concluded that where the forecasted but unproduced evidence is "not touted to the jury as a crucial part of the prosecution's case" the potential prejudice can be overcome with an appropriate limiting instruction. Ibid. (emphasis added).
In our view, the prosecutor's recitation of McElveen's statement here was critical and crucial. The only other direct evidence inculpating defendant was Green's testimony that defendant admitted the crime to him. The State points to substantial corroborating evidence. For example, the woman putting out the garbage rendered a version of the events similar to those described by defendant to Green. However, that woman's version would have the shot to the victim's head coming from McElveen and caused by a .22 caliber bullet. That version gives no explanation for the absence of a third bullet. In his summation, the prosecutor theorized that McElveen either missed with his shot or did not intend to shoot Welsh, and that Welsh merely went to the ground when he heard a shot to protect himself. The State also points to Green's identification of the.32 caliber gun, both in court and at the time he gave a statement to police, as the gun defendant brought to his home on the night of the shooting. However, Green acknowledged that he saw the gun that night for only a couple of seconds. He did not give his statement to the police until February 4, 2000, about three-and-one-half months later. Thus, the weight given to his identification of the gun, established by a ballistics expert to be the murder weapon, is open to question.
Defendant also argues on appeal that the prosecutor misstepped in his summation by impermissibly vouching for Green. He said:
If a reasonable person were going to go to a store and buy a witness, I would suggest to you that reasonable person would buy Temil Green. That he was just a good, solid, decent, courageous, I suggest to you, honest kid. He is the type of kid that we hope our sons will grow up to be. Not having everything handed to him on a silver platter or on a silver spoon but when it comes down to your gut to do the right thing, to be honest, to be truthful, to not cave into the pressures, to not succumb to any of the fears, that's courage, ladies and gentlemen.
That is a lot more courage than many of us will ever know and I suggest to you use and that when you determine the credibility of Temil Green, because I'm going to suggest to you that Temil Green was as honest as could be when he gave that statement and was as courageous as could be and I will grant you he was uncomfortable and nervous there and I will talk aboutsuggest to you why that's so. But I'm also going to suggest to you that he is courageous and he gave you honest testimony and he was honest with the police when he said that this defendant, who he knows for 11 years, came in with this murder weapon.
A prosecutor may argue that a witness is credible, so long as the prosecutor does not personally vouch for the witness or refer to matters outside the record as support *765 for the witness's credibility. State v. Scherzer, 301 N.J.Super. 363, 445, 694 A.2d 196 (App.Div.), certif. denied, 151 N.J. 466, 700 A.2d 878 (1997). See also State v. Staples, 263 N.J.Super. 602, 605, 623 A.2d 791 (App.Div.1993) (prosecutor may not express a personal belief or opinion regarding the truthfulness of his or her witness's testimony); State v. Frost, 158 N.J. 76, 727 A.2d 1 (1999) (improper for prosecutor to imply that police had no motive to lie).
After McElveen refused to testify, the State's case rested heavily on the testimony of Green. Defendant did not confess. There was no eyewitness identification. There was no forensic evidence linking defendant to the crime. Other evidence presented by the State was corroborative of Green's testimony, but, as we have pointed out, some of that corroboration was less than ironclad. It is an understatement to say that Green's credibility was critical to defendant's conviction. The prosecutor's comments quoted above exceeded merely supporting Green's credibility with evidence. The comments can well be understood to be an expression of the prosecutor's personal belief in Green's truthfulness. One of the evils to be avoided by prohibiting vouching for a witness is the circumstance where counsel states or implies that the jury can accept the witness's credibility based upon information outside the trial evidence. The situation here had the clear capacity to constitute such an implication.
In his opening statement, the prosecutor announced what McElveen told law enforcement from the beginning and consistently adhered to, namely that defendant was a perpetrator in this crime and indeed the more culpable perpetrator, the shooter. Then, at the conclusion of the trial, the same prosecutor repeatedly expressed his belief in Green's honesty. He told the jurors Green was completely honest when he gave his statement to the police and completely honest in his testimony. This had the capacity to impart to the jury that the prosecutor knew Green was honest because of extrinsic evidence, namely McElveen's statement to the police. That statement, provided to the jury at the outset of the trial, was never tested by cross-examination, and was never subject to a credibility evaluation of McElveen by the jurors.
Finally, we are unpersuaded by the State's argument that defendant should not be permitted to benefit on appeal from a strategic choice made at trial. When McElveen refused to testify defendant did not move for a mistrial, but instead attempted to use to his advantage McElveen's refusal to testify. However, when defense counsel attempted to argue in summation that the State should be penalized in the jury's deliberative process because of its failure to present the evidence it promised, the judge precluded the argument. The judge did so based upon State v. Clawans, 38 N.J. 162, 171, 183 A.2d 77 (1962). However, defense counsel insisted he was not making a Clawans argument, namely he was not asking the jury to draw an adverse inference from the State's failure to call McElveen as a witness. Instead, he was attempting to argue that the jury should find reasonable doubt based upon a lack of evidence. At that point, any strategic choice made by defense counsel was frustrated. The proffered argument was proper, and should have been allowed. Even without that circumstance, however, reversal would be required.
We cannot find the error here harmless. Error will not cause reversal unless it is "clearly capable of producing an unjust result." R. 2:10-2. Not any error will warrant setting aside a conviction and ordering a new trial. In evaluating claims of prosecutorial misconduct and plain error the fundamental question we must answer is whether it is clear beyond *766 a reasonable doubt that the jury would have returned a guilty verdict if the questioned conduct had not occurred. State v. Macon, 57 N.J. 325, 335-36, 273 A.2d 1 (1971). If the possibility of an unjust result is sufficient to raise in our minds a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached, a new trial is required. Id. at 336, 273 A.2d 1.
From our review of the record, we lack confidence that the jury would have convicted without being told of McElveen's untested statement and without the prosecutor's vouching for Green. In other words, we are not convinced beyond a reasonable doubt that absent these improprieties the jury would have found defendant guilty beyond a reasonable doubt. We thus cannot conclude that defendant received a fair trial, and we are constrained to reverse and remand for a new trial.
Reversed and remanded.