**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4423-16T3

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DARON J. SIMMS,

     Defendant-Appellant.

_____

Submitted October 22, 2018 – Decided December 28, 2018

Before Judges Sabatino and Sumners.

On appeal from Superior Court of New Jersey, Law Division, Monmouth County, Indictment Nos. 14-11-1987 and 16-03-0486.

Joseph E. Krakora, Public Defender, attorney for appellant (Stephen W. Kirsch, Assistant Deputy Public Defender, of counsel and on the briefs).

Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney for respondent (Carey J. Huff, Assistant Prosecutor, of counsel and on the briefs).

PER CURIAM

Defendant Daron J. Simms was indicted for first-degree armed robbery, N.J.S.A. 2C:15-1, and fourth-degree possession of a weapon for an unlawful purpose, an imitation firearm, N.J.S.A. 2C:39-4(e). The weapon charge was dismissed by the State prior to trial.

Tried by a jury, defendant was found guilty of armed robbery. He subsequently pled guilty to possession of a controlled dangerous substance, cocaine, N.J.S.A. 2C:35-10(a)(1), arising from a separate indictment, in consideration for a three-year prison term to run concurrent with the armed robbery offense. He was later sentenced to an aggregate prison term of twelve years subject to the No Early Release Act, N.J.S.A. 2C:43-7.2.

On appeal, he argues:

> POINT I
>
> THE TRIAL JUDGE IMPROPERLY BARRED THE DEFENSE FROM CROSS-EXAMINING THE VICTIM REGARDING WHETHER HE WAS MOTIVATED TO TESTIFY IN A PARTICULAR WAY IN ORDER TO OVERCOME HIS STATUS AS AN UNDOCUMENTED IMMIGRANT AND RECEIVE A U-VISA, AS A CRIME VICTIM, TO ALLOW HIM TO STAY IN THIS COUNTRY LEGALLY; WITNESS BIAS IS ALWAYS A RELEVANT TOPIC.

A-4423-16T3

POINT II

THE JUDGE COMMITTED REVERSIBLE ERROR IN REFUSING TO GIVE A REQUESTED JURY INSTRUCTION ON THE EFFECT THAT VIEWING MULTIPLE PHOTOGRAPHS OF A SUSPECT MIGHT HAVE ON A LATER IDENTIFICATION.

We affirm because we conclude that Judge Leslie-Ann M. Justus did not abuse her discretion in barring defendant's request to solicit testimony from the robbery victim, regarding the victim's undocumented immigrant status, and did not err in denying defendant's request to instruct the jury on multiple - viewings identification of defendant.

I

Prior to trial, Judge Justus conducted a Rule 104 hearing to determine if defense counsel could attack the credibility of V.L.,[1] the robbery victim, by questioning him about his illegal entry into our country, his status as an undocumented immigrant, and whether the State had promised him it would help him obtain a U-visa[2] in consideration for his testimony against defendant.

---

[1]  We use initials to protect the privacy of the crime victim.

[2]  The U-visa is special visa under federal law, which allows non-citizen victims of violent crimes to remain in the United States as lawful temporary residents if they assist in the prosecution of certain enumerated criminal offenses.  8 U.S.C. § 1101(a)(15)(U)(i)(III).

A-4423-16T3

V.L., about twenty-four years old at the time of his testimony, stated that since he entered this country illegally when he was sixteen years-old, his status has remained "undocumented." He testified that he was not promised anything in exchange for his trial testimony, and was unaware that he could obtain legal immigrant status in exchange for his testimony. In response to the question if he knew what a U-visa was, V.L. remarked, "To tell you the truth, no."

Finding V.L. credible, the judge found that there was no factual basis to allow the jury to hear testimony concerning any promise to help V.L. obtain a U-visa due to his cooperation in testifying at trial against defendant. The judge reasoned:

> I find having had an opportunity to see and hear . . . [V.L.,] . . . I find that he frankly did not know what in the world we were talking about, what we were getting at in terms of this whole immigration status, . . . in terms of law enforcement having promised him anything with respect to his immigration status.
>
> . . . [O]n the one hand, . . . the alleged victim understands that . . . he is here illegally, but then on the other hand, he believes that certain aspects of his being here is okay. He referenced his passport and other documentation and that he has some other document from the Mexican consulate.
>
> I asked him specifically and I credit his testimony that the police officers never discussed his immigration status. So[,] if they never discussed his immigration status, how could they possibly promise him anything

with respect to his immigration status with respect to testifying as an alleged victim in this case.

. . . I credit his testimony that he does not know what a U-[v]isa is.

Applying N.J.R.E. 403, the judge found "there [to be] no probative value . . . of disclosing the immigration statues of [V.L.] to the jury. It could have . . . prejudice[d] the jurors against [V.L.] based on bias and preconceived ideas about illegal immigrants." Therefore, she denied "the defense's request to ask [V.L.] anything whatsoever about his immigration status . . . ."

The trial revealed the following facts. On a July 2014 night, about ten minutes before closing, V.L. was alone cleaning up a pizzeria in Neptune when a man wearing a ski mask with openings for his nose and eyes entered and pointed a gun at his head demanding money from the cash register. When V.L. pointed up at the store's security cameras and warned the assailant that the police were watching, the assailant left the store. According to V.L., who had worked at the pizzeria for "two to three years," he recognized the assailant as a regular customer based on his height, thin build, and voice. The assailant would patronize the store once or twice a day; in the morning, he usually ordered a breakfast sandwich.

A-4423-16T3

The police later arrived in response to V.L.'s 911 call. Due to V.L.'s limited English, he was only able to tell the police that the assailant was a regular customer, describing him as a young, thin black male, wearing dark clothing and a black "cloth"[3] covering his face, and carrying a yellow bag. V.L., however, did not know his name. Police obtained a recording of the robbery from the shop's surveillance cameras, which was played to the jury. V.L. also stated that the assailant was in the shop earlier that day, but the police were unable to view surveillance footage from earlier that day because the recording did not go back that far.

Two days after the attempted robbery, V.L. took a photo with his cell phone of a man he believed was a friend of the assailant because they had often come into the pizzeria together. He then showed it to Neptune Police Sergeant Kevin O'Donnell, the investigating police officer, who recognized the man. A couple of days later, V.L. identified the assailant in photos on the Facebook

---

[3] At that time, V.L. did not know the English word for ski mask. Consequently, the police were confused as to whether V.L. indicated the assailant was wearing a bandana, stocking, or something else.

pages of the assailant's friend and patrons of the pizzeria, and then showed them to the police[4]

In early August, Sergeant O'Donnell saw defendant at the Neptune Municipal Courthouse. Defendant was questioned and, after waiving his Miranda[5] rights, he gave a formal statement about his knowledge of the pizzeria robbery. Defendant first claimed he was in Virginia at the time of the robbery. He also stated that he had never been in the pizzeria or knew where it was. However, this assertion conflicted with his statement to Sergeant O'Donnell in April 2014, in connection with an investigation into his report that he was on his way to the pizzeria prior to being a crime victim. Defendant was subsequently arrested, and charged with armed robbery of V.L. and possession of an imitation weapon for an unlawful purpose.

At the conclusion of the testimony, defendant requested to include the following provision of the model jury charge on identification:

---

[4] In a pretrial ruling by a different judge, it was determined that the State could present testimony regarding V.L.'s identification of defendant through photos on Facebook, and his showing of the photos to the police. However, V.L.'s identification of defendant in a law enforcement-conducted photo array was found to be inadmissible because it was conducted without an interpreter and, thus, unreliable.

[5] Miranda v. Arizona, 384 U.S. 436 (1966).

(3) Multiple Viewings: When a witness views the same person in more than one identification procedure, it can be difficult to know whether a later identification comes from the witness's memory of the actual, original event or of an earlier identification procedure. As a result, if a witness views an innocent suspect in multiple identification procedures, the risk of mistaken identification is increased. You may consider whether the witness viewed the suspect multiple times during the identification process and, if so, whether that affected the reliability of the identification.

[Model Jury Charge (Criminal) Identification: In-Court and Out-Of-Court Identification (rev. Sept. 4, 2012).]

Judge Justus rejected this charge request because law enforcement was not involved with V.L.'s Facebook photos identification, and instead decided to amend the identification model charge to provide that V.L. identified defendant as his assailant based on his dealings with him as a patron of the pizzeria and "observing" him in Facebook pictures.[6]

---

[6] In denying defendant's motion for new trial in which he argued, among other things, that the multiple viewings charge was required for V.L.'s Facebook identification testimony, the judge reasoned:

This [c]ourt finds that these three pictures were properly identified and authenticated by the victim who found the pictures of [d]efendant on Facebook by looking at the Facebook pages of a friend of his and the Facebook pages of the patrons of the deli.

8

II

In Point I, defendant argues that the trial judge's pretrial evidentiary ruling denied him the right to confront his accuser under the Sixth Amendment and his due process rights under the Fourteenth Amendment and our state constitution. We are unpersuaded.

A judge's decision to admit or exclude evidence is "'entitled to deference absent a showing of an abuse of discretion, i.e., [that] there has been a clear error of judgment.'" Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016) (alteration in original) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). "Although a trial court retains broad discretion in determining the admissibility of evidence, that discretion is abused when relevant evidence offered by the defense and necessary for a fair trial is kept from the jury." State v. Cope, 224 N.J. 530, 554-55 (2016). "Thus, we will reverse an evidentiary ruling only if it 'was so

---

The victim was then able to identify [d]efendant's picture and he took them to the police. Det. Webb went on the same website and was able to obtain these pictures and other pictures as well. Even if these pictures were improperly admitted into evidence, which this [c]ourt has already denied such a finding, their admission was incapable of producing an unjust result. . . . A reasonable jury could have found [V.L.] to be a credible witness.

9

wide [of] the mark that a manifest denial of justice resulted.'" Griffin, 225 N.J. Super. at 413 (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)).

The Sixth Amendment to the Constitution of the United States and Article I, Paragraph 10 of our state Constitution guarantees an accused in a criminal case the right to confront adverse witnesses. State v. Guenther, 181 N.J. 129, 147 (2004). "A defendant's right to confrontation is exercised through cross-examination, which is recognized as the most effective means of testing the State's evidence and ensuring its reliability." Ibid. (citations omitted). The Confrontation Clause was not, however, "intended to sweep aside all evidence rules regulating the manner in which a witness is impeached with regard to general credibility." Id. at 150 (citing Davis v. Alaska, 415 U.S. 308, 321, (1974)) (Stewart, J., concurring).

Defendant no longer contends, as he did before the trial judge, that he was entitled to attack V.L.'s credibility merely because V.L. violated the law by illegally entering this country. Defendant now maintains the judge erred in accepting V.L.'s assertion that he knew nothing about a U-visa and that he did not agree to testify because the State promised to help him obtain a U-visa. This prevented him from attacking V.L.'s credibility by probing V.L.'s potential bias due to at trial.

Our Supreme Court has recently rendered rulings that guide us. In State v. Scott, 229 N.J. 469, 481 (2017), the Court addressed the extent to which a jury can hear testimony attacking a witness's credibility, holding:

> Rule 607 permits, "for the purpose of impairing or supporting the credibility of a witness, any party including the party calling the witness [to] examine the witness and introduce extrinsic evidence relevant to the issue of credibility," unless an exception within that rule applies or either Rule 405 or 608 renders the evidence inadmissible.
>
> Those Rules preclude the use of specific instances of conduct to attack the credibility of a witness. N.J.R.E. 405 provides that "[s]pecific instances of conduct not the subject of a conviction of a crime shall be inadmissible," and N.J.R.E. 608 indicates that "a trait of character cannot be proved by specific instances of conduct" unless the prior act was a "false accusation against any person of a crime similar to the crime with which defendant is charged." Otherwise, relevant evidence may also be excluded on the ground that "its probative value is substantially outweighed by the risk of . . . undue prejudice." N.J.R.E. 403.

Concerns of prejudice regarding a jury's knowledge of a party's immigration status were also emphasized by the Court in State v. Sanchez-Medina, 231 N.J. 452 (2018). There, the Court ruled that under certain situations "proof of a person's immigration status can be admissible. If the prosecution, for example, promised a witness favorable immigration treatment in exchange for truthful testimony, a jury would be entitled to assess the witness's credibility

A-4423-16T3

in light of that promise." Id. at 463. Citing federal and state courts, as well as this court's decision in Serrano v. Underground Utilities Corp., 407 N.J. Super. 253, 274, (App. Div. 2009) (restricting discovery relating to a party's immigration status because it is very likely to trigger negative sentiments in the minds of some jurors.), which addressed the relevancy and prejudicial effect of immigration status, the Court held:

> A defendant's immigration status is likewise not admissible under other rules of evidence. It is not proof of character or reputation that can be admitted under Rules 404 or 608. . . . Nor is a person's immigration status admissible as a prior bad act under Rule 404(b). To be admissible, such evidence must be "relevant to a material issue," and its probative value "must not be outweighed by its apparent prejudice." State v. Cofield, 127 N.J. 328, 338, 605 (1992) (factors one and four of multi-factor test). Proof of a defendant's immigration status fails on both counts.

Applying these principles, we conclude the judge did not abuse her discretion in denying defendant the ability to question V.L. at trial regarding the existence of an alleged agreement with the State that it would assist him in getting a U-visa in consideration for his trial testimony. Given the highly prejudicial effect of informing the jury that V.L. was an undocumented immigrant, it was appropriate for the judge to evaluate the credibility of the alleged agreement to make sure that a baseless assertion by the defense would

12

not infect the jury's fair consideration of the evidence. As <u>Sanchez-Medina</u> indicates, it is within the trial judge's province to determine if evidence of immigration status is probative and has an undue prejudicial effect.

Judge Justus had the opportunity to hear V.L. testify that he was unaware of the U-visa program and that his testimony was not influenced by an agreement with the State. Considering defendant presented no evidence to the contrary, we accept the judge's credibility assessment without reservation.

Defendant's reliance on <u>State v. Marroccelli</u>, 448 N.J. Super. 349 (App. Div. 2017), to contend that it was up to the jury to make the credibility assessment of V.L.'s claim that he was unaware of U-visas, instead of Judge Justus, is misplaced. There, we ruled that the trial judge erred in barring evidence that went to the ultimate issue of fact as to who was driving a vehicle and responsible for causing the victim's death, which was clearly capable of producing an unjust result. <u>Id.</u> at 371. In this case, V.L.'s immigration status was not an ultimate issue of fact. Moreover, as <u>Sanchez-Medina</u> recognized, it is up to the trial judge to decide in her discretion whether evidence of immigration status is admissible under <u>Rule</u> 403.

Thus, defendant's request to question V.L. about obtaining a U-visa was properly denied because the judge reasonably concluded the inquiry had no probative value to a relevant fact and was unduly prejudicial to the State's case.

III

In Point II, defendant argues that the trial judge erred in denying his request to include the concept of multiple viewings in the jury charge on identification. We conclude there was no error.

It is well-settled that "[c]lear and correct jury instructions are essential for a fair trial." State v. Randolph, 441 N.J. Super. 533, 558 (App. Div. 2015) (quoting State v. Brown, 138 N.J. 481, 522 (1994)). A court should tailor a model jury charge to the facts of the case. See State v. Concepcion, 111 N.J. 373, 379 (1988). "'[E]rroneous instructions on material points are presumed to' possess the capacity to unfairly prejudice the defendant." State v. Baum, 224 N.J. 147, 159 (2016) (quoting State v. Bunch, 180 N.J. 534, 541-42 (2004)). However, "[n]o party is entitled to have the jury charged in his or her own words; all that is necessary is that the charge as a whole be accurate." State v. Jordan, 147 N.J. 409, 422 (1997).

Thus, when the trial judge does not give a jury a charge requested by defendant, we must determine if the omission of the charge was not harmless

error.  See State v. Macon, 57 N.J. 325, 337-38 (1971).  We determine "whether an error is harmless depend[ing] upon some degree of possibility that it led to an unjust verdict."  State v. Burton, 309 N.J. Super. 280, 289 (App. Div. 1998).  "If the possibility of an unjust result is sufficient to raise in our minds a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached, a new trial is required."  State v. Walden, 370 N.J. Super. 549, 562 (App. Div. 2004).

We are satisfied that the charges given were adequately tailored to address V.L.'s identification of defendant as his assailant.  V.L.'s viewings of defendant on Facebook were not what the "multiple viewings" provision of the identification process contemplated in the model jury charge, as defendant contends.  The provision is meant to avoid the "risk of 'mugshot exposure' and 'mugshot commitment[,]'" when law enforcement shows a photo array to a witness of a crime.  See State v. Henderson, 208 N.J. 208, 255 (2011). "Mugshot exposure is when a witness initially views a set of photos and makes no identification, but then selects someone – who had been depicted in the earlier photos – at a later identification procedure."  Ibid.  "Mugshot commitment occurs when a witness identifies a photo that is then included in a later lineup procedure."  Id. at 256.  Neither applies in this case, as V.L., on his own without

police involvement, identified defendant's photo in separate Facebook posts after he had substantial contact with defendant prior to the robbery. Besides, based upon our review of the judge's instructions, the jury was given the proper guidance to assess V.L.'s identification. There was no prejudice to defendant on the charge provided.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4423-16T3