# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1977-16T3

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

C.R.,

     Defendant-Appellant.

_____

Submitted September 13, 2018 – Decided July 10, 2019

Before Judges Simonelli, Whipple and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 16-07-0875.

Jeffrey S. Mandel, attorney for appellant.

Dennis Calo, Acting Bergen County Prosecutor, attorney for respondent (Ian C. Kennedy, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Following a jury trial, defendant C.R. was convicted of second-degree sexual assault of a child less than thirteen years old, N.J.S.A. 2C:14-2(b); first-degree-aggravated assault, N.J.S.A. 2C:14-2(a)(1); and third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1).[1]  On December 2, 2016, the trial court sentenced defendant to an aggregate twenty-two-year term of imprisonment with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2.  Defendant is subject to the requirements of Megan's Law, N.J.S.A. 2C:7-1 to -22, and parole supervision for life, N.J.S.A. 2C:43-6.4.

On appeal, defendant raises the following contentions:

> POINT I
>
> EVIDENCE HEARD BY THE JURY FROM A DETECTIVE ABOUT [THE VICTIM'S] VERSION IMPLICATING [DEFENDANT] BEING "THE TRUTH" AND FROM [THE VICTIM'S] MOTHER ABOUT [THE VICTIM] HAVING TOLD THE "ENTIRE TRUTH" AND FROM THE PROSECUTOR ABOUT [THE VICTIM] BEING "INCAPABLE OF LYING" DEPRIVED [DEFENDANT] OF A FAIR TRIAL.  (Not Raised Below).

---

[1]  The jury found defendant not guilty on another count of second-degree sexual assault of a child less than thirteen years old, N.J.S.A. 2C:14-2(b), and two other counts of first-degree-aggravated assault, N.J.S.A. 2C:14-2(a)(1).

POINT II

THE STATE DEPRIVED [DEFENDANT] OF A FAIR TRIAL BY TELLING THE JURY THAT CHILD ABUSERS "HIDE" EVIDENCE AND BY MISREPRESENTING THAT THE MAN WHO IMPREGNATED THE [VICTIM] − HER OWN STEP[FATHER] - "HAD HIS DAY IN COURT" AND RECEIVED A SENTENCE THAT WAS "NOT ENOUGH" AND "THIS IS [DEFENDANT'S] DAY," THEREBY PRESENTING FALSE FACTS AND HIGHLIGHTING TO THE JURY THAT THEY ARE THE [VICTIM'S] LAST CHANCE TO MAKE SOMEONE PAY FOR WHAT HAPPENED. (Not Raised Below).

POINT III

THE STATE DEPRIVED [DEFENDANT] OF A FAIR TRIAL BY ELICITING FROM ITS LEAD DETECTIVE THAT INVESTIGATIONS BY THE SPECIAL VICTIMS UNIT DO NOT FREQUENTLY RESULT IN CRIMINAL CHARGES, THEREBY LEAVING THE JURY TO BELIEVE THAT SOMETHING SPECIAL WARRANTED CHARGES AGAINST [DEFENDANT] OR TO SPECULATE THAT ADDITIONAL EVIDENCE EXISTS. (Not Raised Below).

POINT IV

THE COURT BELOW DEPRIVED [DEFENDANT] OF A FAIR TRIAL BY FAILING IN ITS ROLE AS GATEKEEPER OF: (1) INADMISSIBLE NET OPINION TESTIMONY; AND (2) INADMISSIBLE SCIENTIFICALLY-UNRELIABLE EXPERT OPINION ON CHILD SEXUAL ABUSE

3

ACCOMMODATION SYNDROME. (Not Raised Below).

POINT V

THE COURT BELOW ERRED IN REFUSING TO ADJOURN THE TRIAL AFTER THE STATE PRESENTED TO DEFENSE COUNSEL ON THE DAY OF JURY SELECTION DISCOVERY OBTAINED TWO YEARS EARLIER CONSISTING OF ANOTHER STATEMENT BY [THE VICTIM], INVESTIGATIVE NOTES BY THE LEAD DETECTIVE, AND STATEMENTS BY [THE VICTIM'S] SISTER ABOUT ALLEGEDLY WITNESSING [DEFENDANT] TOUCH [THE VICTIM], EVEN THOUGH THE STATE FOUND [THE VICTIM'S] SISTER'S CLAIMS TO BE SUSPECT.

For the following reasons, we affirm.

## I.

The child victim, I.C. (Ida)[2] lived with her mother, C.S. (Catherine), stepfather, O.S. (Omar), and sister. Catherine worked from 10:00 p.m. until 7:00 a.m. and Omar worked in the construction and garbage collection industries. Defendant, a friend of the family who worked with Omar, would come to Ida's home in the morning to babysit her and her sister while Catherine and Omar were at work or when Omar went to pick up Catherine from work.

---

[2] We use fictitious names to identify the victim and others involved in this matter pursuant to N.J.S.A. 2A:82-46 and Rule 1:38-3(c)(9).

Omar trusted defendant and Catherine considered defendant "closer than a family member."

According to Ida, defendant began sexually assaulting her in 2011, when she was nine years old and in the third grade. Defendant would go into her bedroom, wake her up, touch her on her breasts and genitalia, and perform sexual acts on her. She described the touching as forceful and painful.

Ida never told Catherine about the sexual assaults because she did not want her to know what was happening or cause her pain and was afraid Catherine would not talk to her and would stay mad at her for the rest of her life. However, Ida told Omar about the sexual assaults "like a week" after they first occurred, but Omar told her "don't worry, it's going to be fine." Omar spoke to defendant, who admitted what he had done, but defendant kept coming to the house and sexually assaulting Ida.

Defendant stopped sexually assaulting Ida by the end of the third grade. Thereafter, Omar began sexually assaulting her in 2012, when she was ten years old and in the fourth grade. In February 2014, when Ida was twelve years old and in the fifth grade, she discovered she was pregnant. Omar was aware of the pregnancy and told Ida to lie and make up a story that a boy at school impregnated her. Omar also told Ida "[i]t's not going to be [her] fault because

[defendant] made [her] start[,]" meaning that "[defendant] was the one who . . . did it first so [Omar] might not even get in trouble if he did it, too." However, Ida did not make up anything about defendant in order to help her stepfather and Omar did not tell her to make up anything about defendant or not tell anyone about defendant.

Catherine took Ida to the doctor after noticing the child was pale, not eating well, and her school grades were declining. The doctor informed Ida she was pregnant, which was the first time Catherine became aware of Ida's condition. Ida told Catherine that a boy from school impregnated her and said nothing more.

The New Jersey Division of Youth and Family Services reported Ida's pregnancy to the Bergen County Prosecutor's Office (BCPO). Catherine took Ida to the BCPO to meet with Detective Jennifer Rueda from the Special Victims Unit (SVU). Rueda had been a police officer for approximately ten-and-one-half years and had been working in the SVU for approximately three-and-one-half years. She was the lead investigator for this case and completed a forensic interview with Ida.

During the interview, Ida initially told Rueda that a boy from school she did not know had impregnated her at the school. Ida could not provide any

other details about the boy or consistent answers about where this occurred in the school. Rueda found Ida's story made no sense based on inconsistencies and the frequency at which she changed the details. It was obvious to Rueda from her training and experience that Ida was "blocking" and not being truthful about who had impregnated her.

Approximately one hour into the interview, Ida admitted she was afraid of getting "someone in trouble" and started to cry. After some assurance from Rueda, Ida admitted that her "dad[,]" meaning Omar, had impregnated her. Rueda then asked Ida to tell what happened from the beginning. Ida responded, "it started with dad's friend" and identified the friend as a man named Charles. Ida told Rueda that Charles sexually assaulted her when she was in the third grade and Omar began sexually assaulting her when she was in the fourth grade. Ida also said that Charles would approach her early in the morning when she was asleep in bed, and described numerous sexual acts with both Charles and Omar.

Rueda asked Ida at which point was she telling the truth and at which point she was lying. Ida admitted her story about the boy at school was a lie, but that what she said about Omar and Charles was true. At trial, Ida admitted that she

A-1977-16T3

lied to Rueda about the boy at school because she was trying to protect her stepfather, but stopped lying and told Rueda the truth about him.

After the interview, Rueda told Catherine about Ida's disclosures. Catherine confirmed that Charles was defendant. The police arrested Omar that evening and defendant the following day. Rueda testified that there was no attempt to retrieve DNA, as the events took place years ago and there would be no purpose in searching for DNA. Similarly, there was no rape kit performed on Ida because of the timing of the events.

The parties stipulated that Ida was approximately seven months pregnant when she met with Rueda; Ida gave birth in April 2014; DNA testing confirmed that Omar was the baby's biological father; and Omar pled guilty to sexually assaulting Ida and was awaiting sentencing.

## II.

We first address defendant's contention raised for the first time on appeal in Point IV that the trial judge erred in admitting expert testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS). We review this contention for plain error. State v. Ross, 229 N.J. 389, 407 (2017). "We may reverse on the basis of [an] unchallenged error only if the error was 'clearly capable of producing an unjust result.'" Ibid. (quoting R. 2:10-2). "The possibility of an

unjust result must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" Ibid. (quoting State v. Williams, 168 N.J. 323, 336 (2001)).

During the pendency of this appeal, our Supreme Court issued its opinion in State v. J.L.G., 234 N.J. 265 (2018).[3] The Court partially overturned its holding in State v. J.Q., 130 N.J. 554 (1993), and held that:

> [b]ased on what is known today, it is no longer possible to conclude that CSAAS has a sufficiently reliable basis in science to be the subject of expert testimony. We find continued scientific support for only one aspect of the theory — delayed disclosure — because scientists generally accept that a significant percentage of children delay reporting sexual abuse.
>
> We therefore hold that expert testimony about CSAAS in general, and its component behaviors other than delayed disclosure, may no longer be admitted at criminal trials. Evidence about delayed disclosure can be presented if it satisfies all parts of the applicable evidence rule. In particular, the State must show that the evidence is beyond the understanding of the average juror.
>
> [Id. at 272 (emphasis added) (citing N.J.R.E. 702).]

The Court noted that admissibility of CSAAS expert testimony on this limited aspect of the syndrome "will turn on the facts of each case." Ibid. When

---

[3] The parties submitted supplemental briefs addressing J.L.G.

9                                                      A-1977-16T3

a victim gives "straightforward reasons about why she delayed reporting abuse, the jury [does] not need help from an expert to evaluate her explanation. However, if a child cannot offer a rational explanation, expert testimony may help the jury understand the witness's behavior." Ibid. The Court, however, concluded that the improper admission of CSAAS testimony may be harmless "in light of the overwhelming evidence of [a] defendant's guilt." Id. at 306.

The Court did not opine with respect to whether its holding applied retroactively. We recently concluded in State v. G.E.P., 458 N.J. Super. 436, 448 (App. Div. 2019), certif. pending, that the holding in J.L.G. "should be given at least pipeline retroactivity," rendering it applicable to all cases in which the parties have not exhausted all avenues of direct review when the Court issued its opinion in J.L.G.[4] Because all four cases pending before the court in G.E.P. were on direct appeal when the Court issued the opinion in J.L.G., we decided "only whether pipeline retroactivity is appropriate." Id. at 446. We offered no opinion with respect to whether the holding in J.L.G. should be given complete retroactive effect, rendering it applicable to all prior convictions. Id. at 450.

---

[4] The parties submitted supplemental letter briefs addressing G.E.P.

Our ruling in G.E.P. does not affect the outcome here because, as defendant concedes, this case is about delayed disclosure, which survives. Defendant argues there was no need for CSAAS testimony because these were not circumstances involving delayed disclosure. Defendant posits that, unlike the examples of delayed disclosure cited in J.L.G.,[5] Ida had disclosed the sexual assaults by defendant to her stepfather "like a week" after they first occurred. Defendant, thus, concludes the judge erred in admitting delayed disclosure expert testimony because that testimony did not meet the Rule 702 standard in general, or the specific requirements addressed in J.L.G. that the case implicates a delayed disclosure issue subject to CSAAS testimony.

We reject defendant's argument. Ida's disclosure to her stepfather of the sexual assaults by defendant was wholly ineffective and meaningless. Omar did not stop defendant's sexual assaults after Ida disclosed them to him in 2011, told her not to worry about it, and ultimately sexually assaulted and impregnated her. Ida did not disclose defendant's continued sexual assaults to anyone else until February 2014, when she disclosed it to Rueda. Defendant cannot seriously contend that Ida's disclosure to Omar, which led only to defendant's continued

---

[5] Examples cited in J.L.G. of delayed disclosure include delays "more than 5 years" and delays that lasted throughout childhood and into adulthood. J.L.G., 234 N.J. at 294.

A-1977-16T3

sexual assaults, constituted meaningful and effective disclosure sufficient to preclude expert testimony as to Ida's delayed disclosure to authority figures. We are satisfied this was a case of delayed disclosure for which CSAAS testimony was relevant and admissible.

We are also satisfied that the CSAAS testimony in this case did not run afoul of J.L.G. or G.E.P. J.L.G. permits expert testimony about delayed disclosure or causes for delayed disclosure; however, "[t]he testimony should not stray from explaining that delayed disclosure commonly occurs among victims of child sexual abuse, and offering a basis for that conclusion." 234 N.J. at 303. In G.E.P. we found it improper for a CSAAS expert to testify that the five CSAAS categories of behavior[6] may be behaviors exhibited by a truthful child sex abuse victim. 458 N.J. Super. at 450-51.

The State's CSAAS expert, Anthony D'Urso, Psy.D., did not testify that the CSAAS categories of behavior, including delayed disclosure, may be behaviors exhibited by a truthful child sex abuse victim, nor did he render an opinion that Ida exhibited any of those behaviors. He merely testified that:

---

[6] The five CSAAS categories of behavior are secrecy, helplessness, entrapment and accommodation, delayed, conflicted, unconvincing disclosure, and retraction. J.L.G., 234 N.J. at 271.

A-1977-16T3

> [CSAAS] is not an evaluative tool. This is not a diagnostic tool or anything that gives you any prediction of [sexual] abuse. This is informational.
>
> Whether it applies to this case or not is your judgment. This is just information about the typical reactions of kids and how that fits in this case is a different issue.
>
> So, there's nothing to be learned by saying, three of the five or four of the five [CSAAS categories of behavior] are present. It's not a diagnostic tool saying we can predict . . . that this child was harmed in any way.

D'Urso informed the jury that CSAAS was "educative in nature" and whether CSAAS "relate[s] to this case or not . . . is a matter of the jury's decision." He also acknowledged he was not familiar with Ida or her behaviors and did not know if her behaviors were consistent with CSAAS. Thus, he rendered no opinion, let alone an impermissible net or speculative opinion, that there was delayed disclosure here.

In addition, following D'Urso's testimony, the trial judge issued a limiting instruction regarding the CSAAS testimony in accordance with Model Jury Charge (Criminal), "Child Sexual Abuse Accommodation Syndrome" (rev. May 16, 2011). In the final charge, the judge reiterated this instruction and also instructed the jury in accordance with Model Jury Charge (Criminal), "Expert Testimony" (rev. Nov. 10, 2003). In both instances, the judge specifically

instructed that the jury "may not consider the expert testimony as in any way proving that [defendant] committed or did not commit any particular act of abuse." The instructions ensured the fact-finding process was not substantially impaired.

This case did not turn on CSAAS testimony, and if it did, the judge provided the appropriate instructions for the jury's consideration of this testimony. The judge specifically instructed the jury that CSAAS is not a diagnostic device and CSAAS cannot determine whether or not abuse occurred. The judge specifically instructed the jury not to consider D'Urso's testimony as offering proof that child sexual abuse occurred in this case, or as proving, in and of itself, that the alleged victim, was or was not truthful. The judge also instructed that the jury could give whatever weight it chose to D'Urso's testimony, but could not consider the testimony as in any way proving defendant committed, or did not commit, any particular act of sexual assault. We are satisfied there was no error, let alone plain error, in the admission of the CSAAS testimony.

III.

Defendant contends for the first time on appeal in Point I that Rueda, Catherine and the prosecutor improperly vouched for Ida's credibility. "Neither

14

a police officer nor another witness may improperly bolster or vouch for an eyewitness' credibility and thus invade the jury's province." State v. Lazo, 209 N.J. 9, 24 (2012). There was no vouching for Ida's credibility here.

Defendant argues that Rueda improperly vouched for Ida's credibility by testifying about the child's eventual truthfulness as to who impregnated her. However, this testimony did not concern defendant. Rueda merely testified that at some point Ida eventually told her the truth, that her stepfather had impregnated her. It was after this disclosure that Ida disclosed defendant had also sexually assaulted Ida. Rueda never testified that Ida was truthful about defendant. More importantly, Rueda's testimony showed that Ida repeatedly lied about who impregnated her. Defense counsel strategically used this testimony during cross-examination and in summation to demonstrate to the jury that Ida was not credible.

Similarly, defendant argues that Catherine improperly vouched for Ida's credibility by testifying that Ida "told the entire truth." However, Catherine made this statement in response to defense counsel's suggestion on cross-examination that she told Ida to blame defendant in order to mitigate Omar's conduct. On re-direct, the prosecutor asked Catherine, "did you ever tell [Ida] to [in]vent something about defendant?" Catherine responded: "No. I always

told her to tell the truth. She always told the entire truth. She was the one who mentioned [defendant]." Thus, the question and answer were directly responding to defense counsel's suggestion that Catherine told Ida to lie about defendant and that the two had conspired to blame him in order to protect Omar.

Further, the trial judge initially instructed the jury that they were the sole judges of the facts and "[a]s judges of the facts [they were] to determine the credibility of the witnesses." During the final jury charge, the judge again instructed the jury that "[y]ou and you alone are the sole and exclusive judges of the evidence, of the credibility of the witnesses, and the weight to be attached to the testimony of each witness." The judge also instructed the jury in accordance Model Jury Charge (Criminal), "False in One False in All" (rev. Mar. 25, 1991), and Model Jury Charge (Criminal), "Prior Contradictory Statements of Witnesses" (rev. May 23, 1994). Thus, the jury received multiple instructions that they had the exclusive power to determine credibility. The instructions were sufficient to remove any prejudice from Rueda's and Catherine's statements. Further, defense counsel used these statements to defendant's advantage, so defendant is unable to demonstrate how he was prejudiced. For these reasons, it is clear that Rueda and Catherine did not vouch for or bolster Ida's credibility.

16

Defendant further contends the prosecutor improperly vouched for Ida's credibility by stating during summation that she was telling the truth and was incapable of lying. "In evaluating claims of prosecutorial misconduct and plain error the fundamental question we must answer is whether it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict if the questioned conduct had not occurred." State v. Walden, 370 N.J. Super. 549, 562 (App. Div. 2004). "[P]rosecutorial misconduct is not grounds for reversal of a criminal conviction unless the conduct was so egregious as to deprive [the] defendant of a fair trial." State v. Timmendequas, 161 N.J. 515, 575 (1999). "However, a failure to make a timely objection indicates defense counsel's belief that the prosecutor's remarks were not prejudicial at the time they were made." State v. Josephs, 174 N.J. 44, 125 (2002).

"A prosecutor may argue that a witness is credible, so long as the prosecutor does not personally vouch for the witness or refer to matters outside the record as support for the witness's credibility." Walden, 370 N.J. Super. at 560. "A prosecutor is not forced to idly sit as a defense attorney attacks the credibility of the State's witnesses; a response is permitted." State v. Hawk, 327 N.J. Super. 276, 284 (App. Div. 2000). In State v. Bradshaw, 392 N.J. Super. 425, 437 (App. Div. 2007) (alteration in original), we held that the prosecutor's

17

statement that the victim was a "good honest woman . . . [an] honorable person," was not reversible error because the statement could be viewed as a response to defense counsel's strong attack on the victim's credibility.

The prosecutor's comments did not rise to the level of prosecutorial misconduct. The verdict depended on whether the jury believed Ida's testimony. In summation, defense counsel repeatedly accused Ida of lying about defendant to mitigate her stepfather's conduct. The State countered the reasons defense counsel argued that Ida should not be believed by refuting many of the purported inconsistencies defense counsel accentuated, and rebutted counsel's argument about Ida's alleged motive to lie. The prosecutor's remarks did no more than respond to defense counsel's strategy and did not constitute improper vouching or bolstering.

Ultimately, the jury determined Ida was credible and that her testimony describing the sexual assaults defendant committed was truthful. It is clear that without the prosecutor comments, the jury would have found defendant guilty beyond a reasonable doubt, as they believed Ida's testimony detailing the crimes. Therefore, the prosecutor's comments were not sufficient to warrant reversal.

IV.

Defendant contends for the first time in Point II that the prosecutor presented false facts during summation. Defendant argues that the prosecutor's comment, "[child abusers] do everything to hide it so that if it ever comes out, the child shouldn't be believed, the child is crazy," was inappropriate since there was no evidence of a cover-up and was, therefore, outside the facts presented at trial. However, the comment was in direct response to defense counsel's summation comment that defendant was innocent because there was no physical evidence of the sexual assaults, and the State was offering a reason for the lack of evidence.

Defendant also argues the prosecutor erred in stating that "Stepdad is not on trial. You know how long Stepdad is going away for? Not enough. That's how long he's getting. He had his day. This is [defendant's] day." Defendant posits this was the equivalent of telling a jury to do its job and convict defendant by inferring that he is the last person who could receive a sentence that provides justice.

In State v. Acker, 265 N.J. Super. 351, 356 (App. Div. 1993), we held it was improper for a prosecutor to comment "that it was the function of the jury to protect young victims of alleged sexual offenses as a group." "Warnings to a

19

jury about not doing its job is considered to be among the most egregious forms of prosecutorial misconduct." Id. at 357. In State v. Goode, 278 N.J. Super. 85, 90-91 (App. Div. 1994), we held it was improper for the prosecutor to argue that convicting defendant would "make a difference" in their communities, as well as implying to the jury that acquitting defendant would be a crime.

However, in reviewing a prosecutor's comments for misconduct, the reviewing court "must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo." United States v. Young, 470 U.S. 1, 12 (1985). It is appropriate for a prosecutor's remarks to respond substantially in order to "right the scale." Id. at 13. The appropriate analysis is "whether the prosecutor's invited response, taken in context, unfairly prejudiced [the] defendants[.]" State v. Engel, 249 N.J. Super. 336, 379 (App. Div. 1991).

The prosecutor's comments were in direct response to defense counsel's comments and trial strategy. The prosecutor's comment that abusers tend to hide evidence was the State's answer to defendant's claim that he was innocent because there was no physical evidence of the sexual assaults, and the comment merely offered a logical reason for that occurrence. In addition, the prosecutor's comment about Omar's sentence did not rise to the level of suggesting that not

convicting defendant would be a crime or telling the jury to do their job. Instead, it was the prosecution's attempt to show the jury that even though the parties had stipulated Omar had plead guilty to sexually assaulting Ida, defendant should not escape conviction for sexually assaulting her. The prosecutor's comments were warranted in response to defendant's contentions and therefore did not prejudice defendant.

V.

Defendant contends for the first time on appeal in Point III that he was prejudiced by Rueda's testimony regarding how often SVU investigations lead to criminal charges. Defendant argues that having a jury hear from the lead detective that approximately one-half of the investigations result in charges improperly signaled to the jury that an experienced law enforcement agent determined defendant committed a crime and the jury should convict him. In the alternative, defendant asserts that this testimony signaled to the jury that Rueda knew of additional facts beyond the record that supported charges against him. Defendant claims this testimony violated Rule 401, because it was irrelevant, and Rule 403, because it was unduly prejudicial. N.J.R.E. 401; N.J.R.E. 403.

Defendant's arguments lack merit. Defense counsel opened the door to the testimony when counsel asked Rueda where referrals to the SVU come from and Rueda acknowledged that referrals come "because someone in a position of authority believes that a criminal act has occurred." Defense counsel then used that testimony to suggest that detectives conducting interviews of children regarding sexual abuse start with the presumption that abuse has occurred. On redirect, the prosecutor referenced these questions by defense counsel to inquire how often the State files charges when a case is referred. For the reasons stated above, the State was permitted to respond to defendant's arguments and contentions. The prosecutor used Rueda's response to dispel the notion that the SVU's investigation was tainted based on defendant's allegation that the detectives automatically file charges in cases referred from other agencies.

VI.

Lastly, defendant contends the judge abused her discretion by refusing to adjourn the trial. Defendant argues the judge should have adjourned the trial because on the day of trial, the State provided defense counsel with discovery obtained two years prior, consisting of another statement by Ida, Rueda's investigative notes and statements by Ida's sister about allegedly witnessing defendant touch Ida. Defendant posits that the judge's denial of his adjournment

22

request denied defense counsel the opportunity to properly investigate this evidence.

"Once an indictment has issued, a defendant has a right to automatic and broad discovery of the evidence the State has gathered in support of its charges." State v. Scoles, 214 N.J. 236, 252 (2013).  The State has an affirmative duty to make timely disclosure of relevant information, Rule 3:13-3(b)(1), and has a continuing duty to provide discovery.  R. 3:13-3(f).  "Late discovery can cause unfair surprise and raise due process concerns."  State v. Smith, 224 N.J. 36, 48 (2016).

"When a party fails to comply with its obligations, the discovery rule expressly states that the court may 'grant a continuance or delay during trial' or 'enter such other order as it deems appropriate.'" Ibid. (quoting R. 3:13-3(f)). "New Jersey long has embraced the notion that '[a] motion for an adjournment is addressed to the discretion of the court, and its denial will not lead to reversal unless it appears from the record that the defendant suffered manifest wrong or injury.'"  State v. Hayes, 205 N.J. 522, 537 (2011) (alteration in original) (quoting State v. Doro, 103 N.J.L. 88, 93 (Sup. Ct. 1926)).  An "abuse of discretion only arises on demonstration of manifest error or injustice[,]" Hisenaj v. Kuehner, 194 N.J. 6, 20 (2008) (quoting State v. Torres, 183 N.J. 554, 572 (2005)),

and occurs when the trial judge's "decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Jacoby v. Jacoby, 427 N.J. Super. 109, 116 (App. Div. 2012) (quoting Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002)).

We discern no abuse of discretion here. As the judge found, the discovery was not burdensome or voluminous, the State provided it approximately eight days prior to opening statements, and the prosecutor did not mislead defense counsel about whether the new witness, Ida's sister, would testify and provided all relevant information concerning the witness.[7] The judge also found that defense counsel had approximately two weeks to review the discovery from the time counsel received it until the time she began defendant's case-in-chief, thus affording counsel ample time to investigate the evidence.

The judge also noted that defendant had been incarcerated for approximately two-and-one-half years and delaying the trial would prejudice him and cause even greater hardship. We are satisfied the judge properly weighed all the factors in denying defendant's request for an adjournment.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[7] Ida's sister did not testify.

A-1977-16T3