SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**State v. Carey R. Greene** (A-96-18) (082536)

**Argued February 4, 2020 -- Decided June 23, 2020**

**ALBIN, J., writing for the Court.**

In the murder trial of defendants Cary Greene and Tyleek Lewis, the prosecutor opened to the jury that the State would present as a witness Greene's grandmother, to whom he allegedly confessed his guilt in the shooting death of Edward Baker. The prosecutor gave a detailed description of the grandmother's expected testimony and a prediction of the emotional struggle she would encounter as a witness against her grandson. Before trial, Greene's grandmother recanted the statement that she gave to the police. She also refused to testify. The Court considers whether the prosecutor's discussion of her anticipated testimony deprived defendants of a fair trial.

On the evening of July 16, 2010, defendants and A.J., a minor at the time who later testified as the State's key witness in accordance with a plea agreement, drove to Baker's residence with the intent to rob him. Once there, Greene and Lewis retrieved guns and entered the residence wearing black-bandana masks; A.J. remained outside. Baker was watching television with two female friends, Ariel Dickens and Courtney Zabala. According to Dickens, Baker confronted the two men while Zabala and Dickens fled through a back door. A few moments later, Dickens heard a gunshot. She returned, discovered that Baker had been shot, and called the police.

Later that evening, detectives interviewed Dickens. For the first fifty-five minutes, she made no mention of the name of any of the perpetrators. During a break, Dickens spoke with Zabala. Afterward, she told the detectives that she recognized one of the robbers as Greene but that she was not certain about the identification.

A.J. testified that he heard a single shot from within the house. Greene and Lewis then came running out, and all jumped into the car. Inside the car, A.J. observed that Lewis was no longer wearing his baseball hat. They drove to the home of Greene's grandmother. Once there, Greene entered his grandmother's house.

Police found a gray baseball hat with the letter "P" at Baker's house. Forensic testing revealed Lewis's DNA on the hat's sweatband and a drop of Baker's blood on the hat's exterior.

1

Investigators conducted a warrant-authorized search of the home of Greene's grandmother, Ethel Smith. While inside her home, Prosecutor's Detective Jayson Abadia took a recorded statement. In her statement, Smith recounted that several days earlier, Greene, while sobbing, related that he and his co-defendants went to the home of a "guy" that they knew sold "weed" intending "to snatch the drugs and run." Greene entered the home armed with a gun, but the robbery quickly went awry. The "guy" grabbed the gun and, during the ensuing struggle, "the gun went off," discharging into the victim. Greene panicked and ran. He told his grandmother that "we did not go there to kill anybody."

As the date of the trial approached, Detective Abadia learned that Smith had moved to Georgia. Smith did not respond to calls or messages and was served with a court order requiring her to return to New Jersey to testify at her grandson's trial. The day after Smith was served with the court order, she spoke with Abadia by telephone. She told the detective that she would return to New Jersey but that she would not "tell any more lies," claiming that the recorded statement she had given was false.

At a pretrial hearing, Smith recanted the statement that she had given to Abadia. The trial court determined that Smith's recorded statement would be admissible when Smith testified, rejecting Smith's testimony that "her story was fabricated." The court issued a written opinion, stating that Smith would be compelled to testify at trial and that if she refused to answer any questions, she would be subject to contempt charges.

In light of those procedural events, the prosecutor gave his opening statement to the jury. During his presentation, the prosecutor told the jurors that they were "going to meet Mrs. Smith during the course of this trial." He then gave a recitation of her expected testimony and highlighted the tension she would face in resolving the conflict between her love of her grandson and her obligation to tell the truth. In his remarks, the prosecutor prepared the jury for Smith's recantation of her recorded statement.

During the trial, Smith notified the State that she would not testify if placed on the stand. In arguing for the admission of Smith's recorded statement, despite her refusal to testify, the prosecutor acknowledged that Greene's "confession is the single most important piece of evidence that could be brought against him." The court nevertheless denied admission of Smith's statement.

Neither Greene nor Lewis moved for a mistrial on the ground that the State's opening prejudiced their ability to receive a fair trial. Instead, at the conclusion of the trial, Greene's attorney requested a jury instruction addressing the issue. Ultimately, with the consent of counsel, the court gave a charge stressing that the statements of counsel are not evidence and that "[a]ny statements the prosecutor made regarding Ethel Smith [are] not evidence and cannot be considered by you in your deliberations." After a number of days of deliberation, the jury found Greene and Lewis guilty of felony murder and related offenses.

2

The Appellate Division overturned both convictions because the prosecutor's unsupported opening statement that Greene had confessed to his grandmother was "too prejudicial to both defendants to be remedied by the court's cautionary instruction." The Court granted the State's petition for certification. 239 N.J. 18 (2019).

**HELD:** The prosecutor's detailed account of Greene's incriminating statement to his grandmother was not likely forgotten by the jury, despite the trial court's best efforts in providing a curative instruction. That the prosecutor acted in good faith, moreover, did not abate the damage done to Greene's ability to receive a fair trial, particularly because the evidence against him was not overwhelming and the prosecutor's opening had the capacity to tip the scales in favor of a conviction. The Court therefore affirms the judgment of the Appellate Division ordering a new trial for Greene.

However, the prosecutor's reference to the grandmother's expected testimony did not implicate Lewis. Additionally, the State presented a more compelling case against Lewis, which included DNA evidence connecting him to the crime and other independent corroborating evidence of his guilt. In Lewis's case, the prosecutor's opening was harmless beyond a reasonable doubt. The Court therefore reverses the judgment of the Appellate Division ordering a new trial for Lewis and remands for consideration of the unaddressed issues he raised in his direct appeal.

1. Because the testimony of witnesses is not always predictable, proceeding with a modest degree of caution in an opening statement may be the safer course when the anticipated testimony is fraught with uncertainty. A prosecutor who describes in excessive detail the testimony he intends to elicit does so at his peril if he is unable to deliver the evidence. Clearly, not every variance between a prosecutor's opening statement and the actual presentation of evidence will constitute reversible error, particularly when the court gives a proper limiting instruction. Nevertheless, some remarks included in an opening statement could be so prejudicial that a finding of error would be unavoidable. (pp. 20-22)

2. When, in his opening statement, the prosecutor alerts the jury that it will hear testimony that the defendant confessed to the crime and then fails to present evidence to support that anticipatory pledge, the defendant's fair-trial rights are directly implicated. A prosecutor -- even one acting in good faith -- cannot in an opening statement dangle an incriminating statement in front of jurors, tell them it implicates a particular defendant, and then expect that they will not use it against that person. Although the Court has not had occasion to squarely address a prosecutor's opening statement that detailed evidence of a defendant's guilt that never materialized because the anticipated witness refused to testify, the Appellate Division and courts from other jurisdictions have ordered new trials under such circumstances. (pp. 22-27)

3

3.  In Greene's case, as the prosecutor conceded, Greene's confession to his grandmother was "the single most important piece of evidence that could be brought against him." That the substance of that confession came from the mouth of the prosecutor in his opening did not diminish its power to make an ineradicable impression in the mind of a juror that no curative instruction likely could erase. The failure of the prosecutor to deliver to the jury the proof he pledged was not a minor variance between the prosecutor's opening and the case he presented. Given Smith's refusal to testify, the prosecutor's opening statement was "clearly capable of producing an unjust result," see R. 2:10-2, and not even the most exemplary curative instruction could have neutralized the lingering prejudicial effect of the confession conveyed to the jury. (pp. 28-30)

4.  The Court reviews the evidence presented and stresses that the State's case against Greene was far from overwhelming. The Court also notes that counsel's participation in requesting and crafting the curative instruction does not make the defense complicit in inviting or acquiescing in an error -- the prosecutor's opening. Counsel could have and should have sought a mistrial if they believed that their clients had suffered irremediable prejudice after Smith refused to testify. The Court does not encourage counsel to delay seeking relief until after the jury returns a verdict. That form of strategic gamble may backfire and is not condoned. In Greene's case, however, even in the absence of a request for a mistrial, he was denied the fair trial guaranteed to him by the Federal and State Constitutions. (pp. 30-33)

5.  Lewis stands in a different position from Greene. His name was not mentioned in the prosecutor's remarks concerning Smith's expected testimony, and the State's case against Lewis included his DNA and the victim's blood on the baseball hat left at the scene -- the hat that A.J. testified Lewis wore on the night of the home invasion. The prosecutor's opening did not deny Lewis his right to a fair trial. (pp. 33-34)

      **As to Greene:    AFFIRMED and REMANDED for a new trial.**

      **As to Lewis:    REVERSED and REMANDED to the Appellate Division.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE ALBIN's opinion.**

4

# SUPREME COURT OF NEW JERSEY
## A-96 September Term 2018
### 082536

State of New Jersey,

Plaintiff-Appellant,

v.

Carey R. Greene and
Tyleek A. Lewis,

Defendant-Respondents.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| February 4, 2020 | June 23, 2020 |

Jennifer B. Paszkiewicz, Assistant Prosecutor, argued the cause for appellant State of New Jersey (Scott A. Coffina, Burlington County Prosecutor, attorney; Jennifer B. Paszkiewicz, of counsel and on the briefs, and Nicole Handy, Assistant Prosecutor, on the briefs).

Zachary G. Markarian, Assistant Deputy Public Defender, argued the cause for respondent Carey R. Greene (Joseph E. Krakora, Public Defender, attorney; Zachary G. Markarian, of counsel and on the briefs, and Alison Perrone, First Assistant Deputy Public Defender, on the briefs).

1

Michael Confusione, Designated Counsel, argued the cause for respondent Tyleek A. Lewis (Joseph E. Krakora, Public Defender, attorney; Michael Confusione, on the briefs).

Evgeniya Sitnikova, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Evgeniya Sitnikova, of counsel and on the brief).

Alan Silber argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Pashman Stein Walder Hayden, attorneys; Alan Silber and CJ Griffin, on the brief).

JUSTICE ALBIN delivered the opinion of the Court.

In opening to a jury, a prosecutor may give a general statement of the evidence the State intends to present to prove the defendant's guilt. When the opening describes particularized details of the defendant's guilt through the expected testimony of a witness who does not materialize at trial, there arises the potential for irremediable prejudice.

In the murder trial of defendants Cary Greene and Tyleek Lewis, the prosecutor opened to the jury that the State would present as a witness Greene's grandmother, to whom he allegedly confessed his guilt in the shooting death of the victim. The prosecutor gave a detailed description of the grandmother's expected testimony and a prediction of the emotional struggle she would encounter as a witness against her grandson.

2

Before trial, Greene's grandmother recanted the statement that she gave to the police. At a hearing before the trial court, the grandmother asserted her Fifth Amendment right against self-incrimination. Despite the court's order compelling her to testify with an assurance of immunity, the grandmother refused to do so, resulting in the court holding her in contempt and jailing her. To remediate any prejudice from the prosecutor's failure to produce the grandmother, with counsels' consent, the court instructed the jury that the prosecutor's opening statement concerning the expected testimony of Greene's grandmother was not evidence or to be considered in its deliberations.

Defendants Greene and Lewis were convicted of murder and related charges.

The Appellate Division overturned the convictions of both defendants. It found that the prosecutor's opening statement, informing the jury about Greene's confession to his grandmother, was highly prejudicial and that the court's curative instruction was inadequate. The Appellate Division could not conclude "beyond a reasonable doubt the jury was not infected by the State's improper opening statement."

We affirm the overturning of Greene's conviction and reverse the overturning of Lewis's conviction. It is well understood that a "defendant's own confession is probably the most probative and damaging evidence that can

3

be admitted against him." Arizona v. Fulminante, 499 U.S. 279, 296 (1991) (quoting Bruton v. United States, 391 U.S. 123, 139 (1968) (White, J., dissenting)). A confession made to one's grandmother may have even greater persuasive power than one made to the police. The prosecutor's detailed account of Greene's incriminating statement to his grandmother was not likely forgotten by the jury, despite the trial court's best efforts in providing a curative instruction. See Bruton, 391 U.S. at 132 n.8. That the prosecutor acted in good faith, moreover, did not abate the damage done to Greene's ability to receive a fair trial, particularly because the evidence against him was not overwhelming and the prosecutor's opening had the capacity to tip the scales in favor of a conviction.

We come to a different result in the case of Lewis. The prosecutor's reference to the grandmother's expected testimony did not implicate Lewis. Additionally, the State presented a more compelling case against Lewis, which included DNA evidence connecting him to the crime and other independent corroborating evidence of his guilt. Unlike in the case of Greene, we conclude that in Lewis's case the prosecutor's opening was harmless beyond a reasonable doubt.

Accordingly, we affirm the judgment of the Appellate Division ordering a new trial for Greene, and we reverse the judgment of the Appellate Division

4

ordering a new trial for Lewis and remand for consideration of the unaddressed issues he raised in his direct appeal.

## I.

## A.

In August 2012, defendants Greene, Lewis, and Toney Holliday were indicted on charges of murder during the commission of a robbery and burglary, N.J.S.A. 2C:11-3(a)(3); first-degree robbery while armed with a deadly weapon, N.J.S.A. 2C:15-1(a)(1); and second-degree burglary, N.J.S.A. 2C:18-2(a)(1). The State alleged that Greene, Lewis, and Holliday killed Edward Baker in his home during a robbery. A fourth participant in the crime, A.J., a minor at the time, testified as the State's key witness in accordance with a plea agreement.

The factual record is based on the proceedings at trial. The events surrounding the shooting death of Baker were recounted to the jury by A.J., who accompanied his co-defendants, and Ariel Dickens, who was in Baker's residence at the time.

On the evening of July 16, 2010, Greene, Lewis, Holliday, and A.J. were driving around Burlington County in search of marijuana when one of them suggested that they "go rob someone." Lewis then drove the car to Baker's residence, the intended target of the robbery. Once there, Greene and Lewis

retrieved guns from a book bag, and all four exited the car, their faces covered with black bandanas.  Lewis was wearing a gray hat with a "P" imprinted on it.  Greene, Lewis, and Holliday entered the residence -- although Holliday left shortly afterward and remained outside with A.J.

When the men entered, Baker was watching television with two female friends, Ariel Dickens and Courtney Zabala.  According to Dickens, the two armed men with black-bandana masks yelled, "Where's your shit?  Give me your shit."  Baker stood up and confronted the two men, pushing one of them, while Zabala and Dickens fled through a back door.  A few moments later, Dickens heard a gunshot.  She then returned, and as Baker walked toward her, he fell to the ground, struggling to breathe.  The stomach area of his shirt was bloodstained.

Dickens called 9-1-1, reporting that Baker had been shot by two men wearing black masks who fled in a black car.  When asked by the 9-1-1 operator, "Who did it?" she replied, "I don't know."  Paramedics arrived at the scene and took Baker to the hospital, where he was pronounced dead.  Later that evening, detectives interviewed Dickens at the police station.  For the first fifty-five minutes of the interview, Dickens made no mention of the name of any of the perpetrators.  During an interview break, Dickens spoke with Zabala.  After doing so, she told the detectives that she recognized one of the

6

robbers as Greene.[1]  She said that she connected Greene's face with a Myspace photo she had seen five years earlier and a Facebook photo two months earlier. She conceded, however, that she was not one-hundred percent certain about the identification.

Dickens stated that Greene was wearing a red-orange t-shirt and the other assailant a black polo shirt, and that neither man had tattoos on his arms or wore a hat.  A video from a nearby Wawa store, however, recorded Greene and Lewis present in the store approximately twenty minutes before the home invasion, both wearing white t-shirts.  The video footage also showed that Greene had tattoos up and down his forearms and Lewis had on a gray baseball hat with a letter "P" -- points corroborated by A.J.

A.J. testified that, while he and Holliday waited outside Baker's home, he heard a single shot from within the house.  Greene and Lewis then came running out, and all four jumped into the car.  Inside the car, A.J. observed that Lewis was no longer wearing his baseball hat and that Holliday was missing a sneaker.  They drove to the home of Greene's grandmother in Willingboro. Once there, Greene entered his grandmother's house with the book bag and returned about five minutes later.  The four young men then proceeded to Pemberton, where they had begun their night's journey.

---

[1]  Zabala did not testify at trial.

A search of Baker's house by the police uncovered a large amount of cash; drugs, including a large amount of marijuana; and a shell casing. Outside the front door, the police found a gray baseball hat with the letter "P" and a Nike sneaker. Forensic testing revealed Lewis's DNA on the hat's sweatband and a drop of Baker's blood on the hat's exterior. Although submitted to the State's laboratory, the sneaker was not tested for DNA.

The defense sharply attacked A.J.'s credibility as a cooperating witness, pointing out his motives for currying favor with the State. To avoid a felony murder charge with a potential minimum thirty-year sentence, A.J. struck a plea agreement with the State. In exchange for his testimony against Greene, Lewis, and Holliday, the State allowed A.J. to plead guilty to a manslaughter charge with a potential seven-year prison term and then postponed his sentence until after he gave his trial testimony. For the approximately four years before trial, A.J. remained free on bail. During that period, he was charged with threatening the mother of his child and regularly used drugs until he overdosed. Additionally, he was not imprisoned after a temporary revocation for failure to appear in court.

B.

The central issue in this appeal concerns the prejudicial effect of the prosecutor's opening statement in which he previewed Greene's alleged

8

confession to his grandmother -- a confession never admitted into evidence because of the grandmother's refusal to testify. The background and postscript to those opening remarks were developed at hearings outside the presence of the jury.

On September 16, 2010, three days after Greene turned himself into the police, investigators from the Burlington County Prosecutor's Office and a local police department conducted a warrant-authorized search of the home of Greene's grandmother, Ethel Smith. While inside her home, Prosecutor's Detective Jayson Abadia took a recorded statement from Smith. In her statement, Smith recounted that several days earlier, Greene had visited her. According to Smith, her grandson, while sobbing, related the following events. Greene and his co-defendants went to the home of a "guy" that they knew sold "weed" intending "to snatch the drugs and run." Greene entered the home armed with a gun, but the planned robbery quickly went awry. The "guy" grabbed the gun and, during the ensuing struggle, "the gun went off," discharging into the victim. Greene panicked and ran, as did the co-defendants. He told his grandmother that "we did not go there to kill anybody" and that "we thought once we went there, if the guy saw the gun he would just give us the drugs."

In September 2014, as the date of the trial approached, Detective Abadia learned that Smith had moved to Troup County, Georgia. Because the State intended to call Smith as a witness, Detective Abadia attempted to contact her, but Smith did not respond to his calls or messages. With the assistance of the Troup County District Attorney's Office, a sheriff's officer contacted Smith and served her with a court order requiring her to return to New Jersey to testify at her grandson's trial. The day after Smith was served with the court order, she spoke with Abadia by telephone. She told the detective that she would return to New Jersey but that she would not "tell any more lies," claiming that the recorded statement she had given was false.

On November 12, 2014, the trial judge conducted a Gross hearing to determine whether Smith's recorded statement was reliable and therefore admissible in the event that Smith was called as a witness.[2] At the hearing, both Abadia and Smith testified to the circumstances surrounding the recorded statement. In her testimony, Smith recanted the statement that she had given

[2] The Gross hearing is the name given to the Rule 104 hearing that the trial court conducts to determine the admissibility of a witness's inconsistent out-of-court statement -- offered by the party calling that witness -- by assessing whether the statement is reliable. See State v. Gross, 121 N.J. 1, 15-17 (1990); State v. Cabbell, 207 N.J. 311, 322 n.5 (2011). N.J.R.E. 104 provides that, in certain circumstances, the court must decide questions concerning the admissibility of a defendant's statement or the invocation of a privilege outside the presence of the jury.

10

to Abadia, asserting that she lied when she said that her grandson had confessed to her. According to Smith, she thought that she was helping her grandson when she described the events as an "accident" and believed that Abadia would accept that account as "more truthful" if she said that it came from the mouth of her grandson. She claimed that the sources of her fabricated account were "hearsay" -- "newspaper and gossip, people gossiping, people talking."

The trial court determined that Smith's recorded statement was "reliable" and would be admissible when Smith testified. In doing so, the court rejected Smith's testimony that "her story was fabricated."

Thereafter, counsel notified the court that Smith intended to invoke her Fifth Amendment right against self-incrimination when called to testify.[3] On January 15, 2015, the court conducted a pre-trial Rule 104 hearing to address the matter. Smith took the stand and was placed under oath, and during questioning about her recorded statement, repeatedly stated, "I plead the

---

[3] The Fifth Amendment provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, our statutes and rules of evidence provide that "[e]very person has in any criminal action in which he is an accused a right not to be called as a witness and not to testify," see N.J.S.A. 2A:84A-17(1); N.J.R.E. 501, and "a right to refuse to disclose in an action . . . any matter that will incriminate him," see N.J.S.A. 2A:84A-19; N.J.R.E. 503.

11

Fifth." When the court asked Smith for the basis of her invocation of the privilege, Smith asserted, "[A] lot of things in that statement is false" and "I don't want to further incriminate myself" or "add false testimony onto the testimony that I already [have] given."

During argument about whether Smith could be compelled to testify, her attorney suggested that the State could "solve this whole problem by giving her privilege. I'm not even sure why we're arguing this right now. If she wants to invoke the Fifth, give her privilege. You can order her to testify and she will."

On January 20, 2015, the court issued a written opinion, stating that Smith would be compelled to testify at trial and that if she refused to answer any questions, she would be subject to contempt charges. The court explained that Smith did not face jeopardy because the State avowed that it would not prosecute her and because the court's overruling of her invocation of the Fifth Amendment privilege protected her "against the use of her trial testimony in any later prosecution for false swearing or perjury." The next day, the prosecutor placed on the record that he had secured from the Attorney General a petition granting Smith immunity in the event that she invoked her Fifth Amendment privilege at trial.

Before the trial began, Smith was not called to the stand to ascertain whether, in fact, she would comply with an order to testify against her grandson.

## C.

In light of those procedural events, the prosecutor gave his opening statement to the jury. During his presentation, the prosecutor told the jurors that they were "going to meet Mrs. Smith during the course of this trial." He then gave a recitation of her expected testimony and highlighted the tension she would face in resolving the conflict between her love of her grandson and her obligation to tell the truth:

> And I want to say just a few words about Mrs. Smith. Mrs. Smith, I don't think it's a stretch to say, is in a difficult position. You see, because sometime after this event, the police went to Mrs. Smith's house, serve[d] some legal papers, and Mrs. Smith got to talking to one of the detectives from the Burlington County Prosecutor's Office and she agreed to give a taped statement to that detective. His name is Jason Abadia and you're going to hear from Mrs. Smith what she said to Detective Abadia and I submit that what she said during this taped statement to Detective Abadia was that at some point after the events of July 16th, she had the opportunity to talk with her grandson, Mr. Greene. In fact, Mr. Greene came over to her house and he was very upset and he told his grandmother what happened on July 16th, 2010. He told his grandmother he went to that house, that he had a gun, that there was a struggle between him and Eddy Baker, and that Eddy

13

Baker got shot. When you're evaluating Mrs. Smith's credibility, use all of the tools that the Court has already told you about. Also, ladies and gentlemen, use that other tool or the one tool I'm asking you to use and that's corroborating evidence. Ask yourself, is what Mrs. Smith telling us credible? Does it jive with other evidence? Is it corroborated by other people?

Now, Mrs. Smith is in a difficult position. She's in the position stuck between the love of her grandson and testifying in court and that's a tough, that's a tough position for Mrs. Smith. I understand that it's a difficult position for her and I just hope that when Mrs. Smith comes to the witness stand you too will appreciate the situation that she's in in testifying here in court.

In those remarks, the prosecutor prepared the jury for Smith's recantation of her recorded statement.

During the trial, Smith notified the State that she would not testify if placed on the stand. The court conducted another Rule 104 hearing to address Smith's refusal to testify and the State's application to admit Smith's recorded statement under two exceptions to the hearsay rule, the prior-testimony-of-a-witness exception, N.J.R.E. 804(b)(1)(A), and the forfeiture-by-wrongdoing exception, N.J.R.E. 804(b)(9).

At the hearing, when Smith was called to the stand, she refused to take the oath and refused to answer any questions, other than to explain: "I told a lie and that's it. I don't have nothing else to say."

14

In arguing for the admission of Smith's recorded statement, despite her refusal to testify, the prosecutor acknowledged that Greene's "confession is the single most important piece of evidence that could be brought against him." The court nevertheless denied admission of Smith's statement because defendants did not have an opportunity to cross-examine Smith, as required by N.J.R.E. 804(b)(1)(A), and because the State did not establish that defendants procured her unavailability, as required by N.J.R.E. 804(b)(9). The Appellate Division granted the State's motion for leave to appeal that evidentiary ruling and then affirmed the trial court's decision.

The State called Smith to the stand one last time -- out of the presence of the jury -- but she again refused to take the oath or answer any questions, despite the court's order and appropriate warnings about the consequences. The court held Smith in contempt and ordered her confined in the county jail. She remained imprisoned for approximately twenty-four days, the duration of the trial.

Neither Greene nor Lewis moved for a mistrial on the ground that the State's opening prejudiced their ability to receive a fair trial. Instead, at the conclusion of the trial, Greene's attorney requested a jury instruction addressing the issue. Ultimately, with the consent of counsel, the court gave the following charge:

15

> The arguments, statements, remarks, openings and summations of counsel are not evidence and must not be treated as evidence. In that regard, during opening statements, the prosecutor indicated that you would hear testimony from Ethel Smith. Ethel Smith did not testify in this case. Any statements the prosecutor made regarding Ethel Smith [are] not evidence and cannot be considered by you in your deliberations.

After a number of days of deliberation, the jury found Greene and Lewis guilty of felony murder and the related offenses. The court granted a mistrial in Holliday's case because the jury was unable to reach a verdict.

The court sentenced both Greene and Lewis to thirty-five-year prison terms, subject to a thirty-year period of parole ineligibility on the felony-murder charge, and merged the related offenses.

## II.

In an unpublished opinion, the Appellate Division overturned both convictions because the prosecutor's unsupported opening statement that Greene had confessed to his grandmother was "too prejudicial to both defendants to be remedied by the court's cautionary instruction." That the prosecutor had a good faith belief that Smith would testify, the court reasoned, was "not crucial because a prosecutor makes representations in opening statements at his or her own peril," citing State v. Land, 435 N.J. Super. 249, 270 (App. Div. 2014). The Appellate Division determined that the prosecutor's remark "that Smith was in a difficult position because she was

16

'stuck between the love of her grandson and testifying in court'" led the jury to "expect[] either that Smith would testify Greene confessed to her, or Smith would fail to testify because she loved Greene too much to reveal his confession." Thus, "[t]he opening not only disclosed extremely damaging testimony that did not materialize, but it also disclosed the reason why the testimony might not be heard."

In the Appellate Division's view, the court's instruction to the jury to disregard the prosecutor's prejudicial remarks "was woefully inadequate" and "could not 'unring the bell.'" It also found that Dickens's identification of Greene was "not compelling" and that A.J.'s testimony "was undercut by his lack of overall credibility." Because the Appellate Division could not conclude "beyond a reasonable doubt the jury was not infected by the State's improper opening statement," it reversed and remanded for a new trial.[4]

We granted the State's petition for certification. 239 N.J. 18 (2019). We also granted the motions of the Attorney General of the State of New Jersey and the Association of Criminal Defense Lawyers of New Jersey (ACDL) to participate as amici curiae.

---

[4] The panel did not address the other issues raised by defendants.

III.

A.

The State argues that the prosecutor's brief reference in his opening to "Smith's anticipated testimony was not egregious and did not prejudice defendant Greene." The State emphasizes that the prosecutor acted in good faith, reasonably believing that Smith would testify after Smith's attorney stated she would if she were provided immunity and ordered to do so. It also submits that the prosecutor's comments on Smith's anticipated testimony did not mention Lewis and therefore did not prejudice him or infect his right to a fair trial.

The State, moreover, points out that counsel for Greene and Lewis did not object to the opening or move for a mistrial after Smith refused to testify, but instead "acquiesced to, and partly crafted" the curative instruction that the court gave in its final charge to the jury. If giving the curative instruction was a mistake, the State reasons, then counsel "invited" that error and should not benefit from their gambit. The State also urges this Court to reject the Appellate Division's characterization of the evidence as less than overwhelming. In particular, in the case of Lewis, the State asserts, the record revealed "weighty evidence" of his guilt, including DNA and blood evidence tying him to the crime.

18

For the most part, the Attorney General echoes those arguments.

B.

Greene and Lewis both claim that they were denied their constitutional right to a fair trial because the prosecutor's opening statement about Greene's alleged confession was a powerful and indelible communication that could not be erased from the jurors' minds by the well-meaning but ineffectual curative instruction.  They focus on the great weight accorded to a confession by a jury and the amount of detail about the confession in the prosecutor's opening.  They suggest that the confession was solidly implanted in the jury's mind because Greene, seemingly, would have had no reason to lie to his grandmother about his role in a killing.

Greene and Lewis, moreover, contend that their right to a fair trial did not turn on whether the prosecutor acted in good faith because our jurisprudence warns about the danger of providing too much detail about evidence that may not materialize.  They also assert that the failure of the State to produce Smith implicated their confrontation rights under the Sixth Amendment and that the evidence against them was less than overwhelming.  Last, they maintain that counsel's request for a curative instruction instead of a mistrial did not relieve the trial court of its obligation to recognize that the

19

prosecutor's recitation of a confession never admitted into evidence was "clearly capable of producing an unjust result," quoting Rule 2:10-2.

The ACDL makes many of the same points.

IV.

The issue before us is whether the prosecutor telling the jury in his opening statement that it would hear Greene's alleged confession to his grandmother and then failing to present testimony eliciting that confession denied defendants Greene and Lewis a fair trial.

We begin with the simple yet fundamental principle that the accused is guaranteed the right to a fair trial by our Federal and State Constitutions. U.S. Const. amends. V, VI; N.J. Const., art. I, ¶ 1; State v. Jenewicz, 193 N.J. 440, 451 (2008) (noting that "[a] defendant enjoys a fundamental constitutional right to a fair trial" protected "not only by the Federal Constitution but also by Article 1, Paragraph 1 of the New Jersey Constitution"). If errors committed during the course of a trial "mortally" cut into a defendant's substantive rights -- errors that have the clear capacity to prejudice the jury against the defendant -- then the fact that the errors were made in good faith or through no fault of the State or court, or even defense counsel, is of no consequence. See State v. Corsaro, 107 N.J. 339, 345-46 (1987). An unfair trial -- a trial that is violative

20

of the fundamental constitutional rights of a defendant -- is not made right because all the players acted in good faith.

This case is a reminder that a trial is not a neatly choreographed or a perfectly scripted proceeding, and that witnesses are driven by various motives -- some easily comprehended and others dimly understood -- that may undermine even the best laid plans of counsel. Because the testimony of witnesses is not always predictable, proceeding with a modest degree of caution in an opening statement may be the safer course when the anticipated testimony is fraught with uncertainty.

Our jurisprudence sets forth the basic contours of an appropriate opening statement by a prosecutor. The State's opening statement should be "limited to the 'facts [the prosecutor] intends in good faith to prove by competent evidence.'" State v. Wakefield, 190 N.J. 397, 442 (2007) (quoting State v. Hipplewith, 33 N.J. 300, 309 (1960)). The prosecutor's opening statement ordinarily is intended to serve as "an outline" or a "roadmap" or a "general recital" of the case the State intends to present, State v. Walden, 370 N.J. Super. 549, 558 (App. Div. 2004) (quoting State v. Torres, 328 N.J. Super. 77, 95 (App. Div. 2000)), and should "not anticipate his final argument," State v. Ernst, 32 N.J. 567, 577 (1960). A prosecutor who describes in excessive detail the testimony he intends to elicit does so at his peril if he is unable to deliver

21

the evidence.  See Walden, 370 N.J. Super. at 558.  In the end, "the court must patrol the boundaries of propriety [of a prosecutor's opening statement] to ensure that [a] defendant's right to a fair trial is not compromised."  State v. Timmendequas, 161 N.J. 515, 577 (1999).

With those general principles in mind, we know that no trial proceeds in a perfect path.  Clearly, "not every variance between" a prosecutor's opening statement "and the actual presentation" of evidence will constitute reversible error, particularly when the court gives a proper limiting instruction.  See Frazier v. Cupp, 394 U.S. 731, 735-36 (1969).  Nevertheless, "some remarks included in an opening . . . statement could be so prejudicial that a finding of error, or even constitutional error, would be unavoidable."  See ibid.[5]

When, in his opening statement, the prosecutor alerts the jury that it will hear testimony that the defendant confessed to the crime and then fails to present evidence to support that anticipatory pledge, the defendant's fair-trial rights are directly implicated.  A prosecutor -- even one acting in good faith

---

[5]  In Frazier, a habeas corpus case, the defendant challenged the prosecutor's mention, during opening, of the expected testimony of a co-defendant that implicated him in the crime.  Id. at 732-33, 738-39.  The co-defendant later refused to testify.  Id. at 734.  The Court noted that the prosecutor's reference to the defendant in the co-defendant's statement was "not emphasized" and was "sandwiched" between a summary of the defendant's own admissible full confession.  Id. at 733, 739.  The Court held that, under the circumstances, "the limiting instructions given were sufficient to protect [the defendant's] constitutional rights."  Id. at 735.

-- cannot in an opening statement "dangle an incriminating statement in front of jurors, tell them it implicates a particular defendant, and then expect that they will not use it against that person." See Brown v. Superintendent Greene SCI, 834 F.3d 506, 519-20 (3d Cir. 2016).

Although this Court has not had occasion to squarely address a prosecutor's opening statement that detailed evidence of a defendant's guilt that never materialized because the anticipated witness refused to testify, the Appellate Division has confronted that precise circumstance.

In Walden, the prosecutor told the jury in his opening statement that it would hear testimony from a cooperating witness -- the defendant's "best friend in the world" and co-perpetrator -- identifying the defendant as the shooter in an execution-style killing. 370 N.J. Super. at 552-55. The co-perpetrator, however, persistently refused to testify in accordance with his agreement with the State, and when the co-perpetrator changed his mind, the prosecutor did not call him to the stand. Id. at 555-56. The Appellate Division concluded that "although the prosecutor's comments in his opening statement may have been made in good faith and did not constitute 'evidence,' the prejudicial effect on defendant was devastating." Id. at 552. On that basis, combined with the prosecutor's summation remarks improperly vouching for

23

the key testifying witness, the Appellate Division reversed the defendant's conviction on the ground that he was deprived of a fair trial.  Id. at 552, 562.

Notably, the defendant in Walden did not move for a mistrial after the co-perpetrator refused to testify, attempting instead to use the prosecutor's misfire to his advantage, a ploy ultimately frustrated by the trial court.  Id. at 561-62.  The Walden court nevertheless found that the trial errors were "clearly capable of producing an unjust result."  Id. at 562 (quoting R. 2:10-2).

In Land, in her opening statement, the prosecutor made extensive representations to the jury that she would call to the stand Kareem Watkins, who would testify that the defendants in that murder trial fired shots at Watkins and a friend, mortally wounding the friend, and that Watkins, who was armed, returned fire.  435 N.J. Super. at 252-53, 272. Watkins "later refused to testify despite a grant of immunity," leaving unproven "numerous factual statements" made by the prosecutor during her opening.  Id. at 252. Neither defendant requested a mistrial, and the court "instruct[ed] the jury that what attorneys say in openings and summations is not evidence."  Id. at 254, 267.

The Appellate Division reversed the defendants' aggravated manslaughter convictions because the prosecutor's "ill-advised opening" required the grant of a new trial "as the only sensible means of redressing the

24

prejudice caused to defendants even when actual bad faith may be absent." Id. at 251, 270, 273. In its view, "[t]he prosecutor's opening statement caused the scales to careen toward the State's side by allowing the jury to anticipate and perhaps even assume the truth of [the prosecutor's] assertions," and it was "unlikely" that any instruction given by the court "could have ameliorated[] the prejudice caused by the prosecutor." Id. at 272-73. The Land court concluded that it was "enough that the opening statement could have contributed to the verdict to warrant a new trial where . . . the evidence of guilt was far from overwhelming." Id. at 271.

Other jurisdictions have reached similar conclusions. See, e.g., State v. West, 617 P.2d 1298, 1300-01 (Mont. 1980) (reversing theft conviction because prosecutor's opening stated that an accomplice, whose statements were "subsequently deemed inadmissible and not presented to the jury," implicated the defendant in the theft of a truck); People v. Cruz, 474 N.Y.S.2d 142, 143-44 (App. Div. 1984) (reversing murder and robbery convictions because the prosecutor's references during the opening to the expected testimony of a critical witness who never testified "unduly prejudiced the defendant and require[d] a new trial," even though there was no "bad faith" on the prosecutor's part and no mistrial request made by the defendant); cf. Smith v. State, 172 S.W.2d 248, 250-52 (Ark. 1943) (reversing a murder conviction,

25

in part because the prosecutor's opening referenced an alleged confession that was later ruled inadmissible and because, despite the good faith of the prosecutor, "no juror could eradicate from his mind what the prosecuting attorney had said in detailing the confession"); State v. Zachmeier, 441 P.2d 737, 738, 740-41 (Mont. 1968) (reversing a murder conviction because the prosecutor's opening statement referenced an alleged confession by defendant that was later ruled inadmissible, and noting that "the fact that there was no malice or intentional disregard of defendant's rights in the opening statement does not expunge the damage"); Commonwealth v. Wilson, 402 A.2d 1027, 1028-30 (Pa. 1979) (reversing a murder conviction because the prosecutor's opening statement referenced a confession by the defendant that was not admitted at trial, and noting that "the good faith of the prosecuting official does not lessen the prejudice").

V.

A.

From the cases above, we can discern some guiding principles applicable to the case before us. A conviction that is the product of an unfair trial will not be saved because the prosecutor acted in good faith. When a prosecutor in an opening statement extensively describes the expected testimony of a key witness -- testimony that fully inculpates the defendant in the crime or relates a

26

defendant's confession -- and the witness refuses to testify, no curative instruction is likely to have the desired effect of removing the taint of the forbidden information from the jurors' minds. That is certainly true of a confession that is erroneously conveyed to a jury.

As the United States Supreme Court has explained, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." Fulminante, 499 U.S. at 296 (quoting Bruton, 391 U.S. at 139 (White, J. dissenting)). Indeed, because of the "profound impact" that a confession is likely to have on a jury, "we may justifiably doubt [the jury's] ability to put [the confession] out of mind even if told to do so." Ibid. (quoting Bruton, 391 U.S. at 140 (White, J. dissenting)); see also id. at 292 (noting that a confession is "so damaging that a jury should not be expected to ignore it even if told to do so"). We cannot ignore the reality that, in some circumstances, a "limiting instruction . . . is a 'recommendation to the jury of a mental gymnastic which is beyond, not only [its] powers, but anybody's else.'" Bruton, 391 U.S. at 132 n.8 (quoting Nash v. United States, 54 F.2d 1006, 1007 (2d Cir. 1932) (Hand, J.)).

### B.

In applying the case law and governing principles to the facts before us, we begin by stating that we have no reason to doubt that the prosecutor acted

in good faith, even if he should have proceeded with greater caution given repeated signals that Smith did not want to testify against her grandson. The prosecutor knew that no matter what Smith said on the stand, the court had declared her taped statement admissible if she testified. Additionally, the court advised Smith that she had immunity from prosecution and therefore could not invoke her Fifth Amendment privilege, and Smith's attorney had said that, with immunity, "You can order her to testify and she will."

But good faith does not resolve the issue of whether Greene and Lewis received a fair trial. In resolving that issue, we must analyze each defendant's case separately.

1.

We start with Greene. The prosecutor conceded that Greene's confession to his grandmother was "the single most important piece of evidence that could be brought against him." We agree. After hearing the prosecutor's opening, a reasonable juror might rightly have thought, what motive would Greene have had to spin a lie to his grandmother implicating himself in a crime, and what motive would the grandmother have had to fabricate her grandson's confession and then memorialize it in a taped statement to a detective? Clearly, Smith's taped statement -- a statement the prosecutor vigorously attempted to place before the jury even after Smith

28

refused to testify -- contained the most profoundly damaging evidence against Greene, his confession to a beloved relative. See Fulminante, 499 U.S. at 296.

That the substance of that confession came from the mouth of the prosecutor in his opening did not diminish its power to make an ineradicable impression in the mind of a juror that no curative instruction likely could erase. See Land, 435 N.J. Super. at 270-71; Walden, 370 N.J. Super. at 558. Because prosecutors hold a position of "great prestige with jurors," "[t]heir statements . . . have a tendency to be given great weight by jurors." Walden, 370 N.J. Super. at 558.

The prosecutor's opening, moreover, suggested not only that Greene's grandmother would be a reluctant witness, but also implicitly provided the reason why she might not testify: "Mrs. Smith is in a difficult position. She's in the position stuck between the love of her grandson and testifying in court."

The failure of the prosecutor to deliver to the jury the proof he pledged -- Greene's confession to his grandmother -- was not a minor or even modest "variance" between the prosecutor's opening and the case he presented. See Frazier, 394 U.S. at 735-36. Instead, the prosecutor failed to present "the single most important piece of evidence" that he promised in his opening remarks. Courts recognize that "some remarks included in an opening" may be so prejudicial that reversal of a conviction will be "unavoidable." See ibid.

29

Greene did not request a mistrial after Smith refused to testify but instead requested a curative instruction. We therefore must look at the decision of the trial court not to declare a mistrial through the lens of plain error. In light of our review of the record, we conclude that, given Smith's refusal to testify, the prosecutor's opening statement was "clearly capable of producing an unjust result," see R. 2:10-2, and that not even the most exemplary curative instruction could have neutralized the lingering prejudicial effect of the confession conveyed to the jury, see State v. Boone, 66 N.J. 38, 48 (1974) (affirming the reversal of the defendant's conviction because the court's curative instruction could not remedy the fact that the jury learned that the defendant had entered a guilty plea that had been withdrawn).

Significantly, we come to this conclusion because the State's case against Greene was far from overwhelming and because we cannot say that the prosecutor's opening remarks were "harmless beyond a reasonable doubt." See State v. McCloskey, 90 N.J. 18, 32 (1982) (quoting Chapman v. California, 386 U.S. 18, 24 (1967)).

No physical or forensic evidence tied Greene to the crime. Dickens testified that she saw two masked and armed intruders enter into Baker's residence before she fled. When she called 9-1-1 after the shooting, she told the operator she did not recognize the intruders. When interviewed by the

30

police, she did not identify Greene as one of the armed men until after a break in the session when she spoke with her friend Zabala. Then, Dickens claimed that she recognized Greene from photographs posted on social media months and years earlier, and even so she was not one-hundred percent certain about the identification. Dickens also stated that the assailant she believed to be Greene had no tattoos and was wearing a red-orange shirt. But A.J. testified that Greene had tattoos running up and down his arms and was wearing a white t-shirt -- observations corroborated by a video that captured Greene at a Wawa located a short distance from Baker's residence approximately twenty minutes before the home invasion.

The other key witness against Greene was A.J., whose credibility was sharply questioned by the defense. Through A.J.'s cooperation agreement with the State, he was guaranteed that he would not face murder charges and that his guilty plea to manslaughter exposed him to no more than a seven-year prison term. As part of the agreement, he remained free on bail for the four years pending the trial during which he collected another criminal charge. A.J. had reason to curry favor with the State, and therefore the jury had the right to subject his testimony to "careful scrutiny." See Model Jury Charges (Criminal), "Testimony of a Cooperating Co-Defendant or Witness" (rev. Feb. 6, 2006) ("The law requires that the testimony of [a cooperating co-defendant]

31

be given careful scrutiny."); <u>see also</u> <u>State v. Artis</u>, 57 N.J. 24, 33 (1970). Indeed, jurors are instructed that they may consider whether a cooperating witness "has a special interest in the outcome of the case and whether his/her testimony was influenced by the hope or expectation of any favorable treatment or reward, or by any feelings of revenge or reprisal." See <u>Model Jury Charges (Criminal)</u>, "Testimony of a Cooperating Co-Defendant or Witness."

The issue is not whether the jury had sufficient evidence, based on the testimony of Dickens and A.J., to return a guilty verdict against Greene, but whether the prosecutor's opening remarks concerning Greene's confession to his grandmother were harmless beyond a reasonable doubt. We do not fault counsel and the trial court for constructing a curative instruction in an attempt to ameliorate the prejudice that flowed from the prosecutor's opening. In the case of Greene, it seems clear that any instruction advising the jury to disregard what it heard would have been ineffectual.

The invited-error doctrine is not implicated here. Neither Greene nor Lewis apparently knew at the time of the prosecutor's opening that Smith would not testify, and therefore had no basis to object. Counsel's participation in requesting and crafting the curative instruction does not make the defense complicit in inviting or acquiescing in an error -- the prosecutor's opening.

32

See State v. Bailey, 231 N.J. 474, 490 (2018) (noting that a request for a jury charge is "not the sort of gamesmanship-driven scenario to which the invited error doctrine is traditionally applied").

For sure, counsel could have and should have sought a mistrial if they believed that their clients had suffered irremediable prejudice after Smith refused to testify. We do not encourage counsel to delay seeking relief until after the jury returns a verdict. That form of strategic gamble may backfire and is not condoned. In Greene's case, however, even in the absence of a request for a mistrial, we cannot overlook that he was denied the fair trial guaranteed to him by our Federal and State Constitutions.[6]

2.

Lewis stands in a different position from Greene. His name was not mentioned in the prosecutor's remarks concerning Smith's expected testimony. Although Smith's recorded statement included references that Greene made about the involvement of Lewis and the other co-defendants, those references were redacted from the statement, and therefore the unfiltered statement would

---

[6] Although we decide this case on Greene's due-process, fair-trial rights, we acknowledge that the introduction of a confession in a prosecutor's opening that is not supported by evidence presented at trial raises Confrontation Clause concerns. Greene had no opportunity to cross-examine Smith about the truth of the statement that she gave to Abadia, and the jury had no opportunity to judge her credibility. See Crawford v. Washington, 541 U.S. 36, 55-59, 61 (2004); Cabbell, 207 N.J. at 328-29.

33

not have been played at trial.  Unlike Greene, we do not find that Lewis was prejudiced by the prosecutor's opening remarks.  Additionally, the strength of the State's case against Lewis included his DNA and the victim's blood on the baseball hat left at the scene -- the hat that A.J. testified Lewis wore on the night of the home invasion.

We therefore determine that the prosecutor's opening did not deny Lewis his right to a fair trial.

## VI.

For the reasons expressed, we affirm the judgment of the Appellate Division overturning Greene's conviction and remand for a new trial.  We reverse the judgment of the Appellate Division overturning Lewis's conviction and remand to the Appellate Division for consideration of the remaining issues raised in his direct appeal.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE ALBIN's opinion.